# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-06-00711-CR

---

**Dino Musaka, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. D-1-DC-05-301296, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Dino Musaka was charged with the offense of intentionally or knowingly causing serious bodily injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp. 2007). A jury found appellant guilty of the lesser included offense of reckless injury to a child and affirmatively found that he used a deadly weapon in the commission of the offense. The jury assessed punishment at ten years' confinement. In three points of error, appellant contends that the evidence was legally and factually insufficient to support his conviction and that the trial court erred in instructing the jury on the lesser included offense of reckless injury to a child. For the reasons that follow, we affirm the judgment of conviction.

## FACTUAL BACKGROUND

In late September 2004, while appellant's wife was at work, appellant was taking care of his three-month-old son, S.M., and his four-year-old daughter, F.M. S.M. was crying "inconsolably" and, in an effort to stop S.M.'s crying, appellant "shook" him.[1] After his wife returned home that evening, she noticed that S.M.'s head was swollen.

Appellant and his wife took their son to their pediatrician on October 4.[2] After examining S.M., their pediatrician expressed concern because S.M. had a "bulging fontanelle"[3] and sent them to a neurosurgeon. S.M. thereafter was checked into the intensive care unit at Children's Hospital in Austin. Doctors at the hospital found that S.M. had six rib fractures, multiple retinal hemorrhaging, and subdural hematomas, injuries consistent with Shaken Baby Syndrome.[4] S.M. underwent several surgeries to relieve the pressure in his brain, including having a shunt placed in

---

[1] What appellant actually did to stop S.M.'s crying was disputed at trial. Appellant, from the time S.M. was admitted into the hospital through the time of trial, demonstrated to different people and at different times, what he did to S.M. At trial, appellant denied that he "shook" S.M.

[2] The length of time between when S.M. was injured and when the parents took S.M. to the doctor was also disputed at trial. Appellant testified that the incident occurred on a Friday and that they took S.M. to the doctor on the following Monday, which was October 4.

[3] According to the testimony at trial, the fontanelle is the soft spot in a baby's skull where the bones have not grown together.

[4] Hillary Onan, a pediatric ophthalmologist who examined S.M., testified at trial:

> If you look at the classical information regarding Shaken Baby, the three classic things that they have are subdural hemorrhages, which is bleeding in the brain, hemorrhages in the retina, which is bleeding in the eye, and rib fractures, and the rib fractures are postulated to be from fingers squeezing them until they break.

his head. S.M.'s prognosis includes that he will have mild to moderate vision loss, motor skill delays, and a shunt in his head for the rest of his life.

Appellant was indicted for the offense of intentional or knowing injury to a child. The indictment alleged that appellant intentionally and knowingly caused serious bodily injury by shaking S.M.'s body and head with appellant's hands, by striking S.M. with a blunt object, or by causing S.M.'s head to strike an unknown object.

At trial, there was testimony concerning the cause and extent of S.M.'s injuries, the amount of force required to cause S.M.'s injuries, and appellant's various physical demonstrations to different people of what appellant did to try to stop S.M.'s crying. Witnesses who testified on behalf of the State included treating doctors, a counselor from the hospital, workers for the Texas Department of Family and Protective Services (the "Department"), a detective in the Austin Police Department's child abuse unit, and appellant's wife. Witnesses to testify on behalf of appellant included appellant and a criminal investigator.

Dr. George Edwards, a pediatrician who examined S.M. on the day that S.M. was admitted to the hospital, testified about his interview with appellant and appellant's wife, S.M.'s symptoms, diseases and disorders that he ruled out, and his diagnosis of "Shaken Impact Syndrome."[5] He testified to the history that he obtained from the parents:

> The history that we obtained was that [S.M.] had previously been well and that approximately one week prior to the time of admission to the hospital we were told that the mother, who was the primary caregiver, had [been] gone for about a four

---

[5] According to Edwards, the terms Shaken Baby Syndrome and Shaken Impact Syndrome are synonymous.

hour period of time . . . and [S.M.] had been left in the sole care of the father. We learned that the baby cried excessively while mom was gone, . . . and the father acknowledged to us he was unable to console the baby. He also acknowledged during that time that he shook the baby. And then when mother returned, . . . she noticed that the fontanelle which had not been bulging before was now bulging. . . . And the mother reported that his eyes looked sad that whole next week and the fontanelle continued to be bulging the following week.

Edwards testified that S.M.'s injuries were "life-threatening." Ruling out that S.M.'s injuries were self-inflicted, accidental, or caused by a "short fall," he testified to the amount of physical force required to cause the type of injuries that S.M. had, including using a DVD for demonstrative purposes.[6] He opined:

Clearly these injuries were nonaccidental. And they are consistent with an episode, of some kind of episode that would generate high-energy, violent forces of acceleration/deceleration such as shaking or possibly even impact against an object that might be soft and not leave an external injury. So certainly consistent with violent shaking and violent squeezing of the chest.

Nancy Tryon, a medical social worker at Children's Hospital, testified to appellant's explanation in front of her, appellant's wife, and Edwards, at the hospital of what happened:

[Appellant] stated that a week prior to coming to the hospital that he was home alone with his infant son. It was about 7:30 at night. The baby was crying inconsolably and stated it was a cry he had never heard before. In order to try to console the baby he did several things . . . . One of which was he said he patted the baby on the back, lifted the baby up in the air and then also shook the baby.

---

[6] According to Edwards's testimony, the DVD showed "an animation depicting shaking where the infant has been held by the chest" and "illustrating the sheering forces that are generated with acceleration and deceleration." The DVD also illustrated an infant's resulting injuries from the depicted shaking that were consistent with S.M.'s injuries.

4

Tryon testified that appellant demonstrated how he tried to console S.M. and she demonstrated for the jury what appellant had demonstrated to her.[7]

Sara Warner, a night duty investigator for the Department, testified to an interview that she and an investigator from the Austin Police Department, Clay Cobb, had with appellant on the day that S.M. was admitted to the hospital. She demonstrated for the jury how appellant demonstrated to her that he tried to stop S.M.'s crying, "a rocking back and forth with his arms crossed in front of him" and appellant told her that "maybe he just did it a little too much or too fast."[8] Cobb also testified to appellant's demonstration to them, describing appellant's demonstration as "cradling" as opposed to "shaking":

Q. Okay. Do you have in your notes how he indicated he shook the baby?

A. Yes, sir.

Q. How was it?

A. When I asked him—when he said that he shook the baby, what I generally ask everybody is show me what you're talking about. And his example that he gave to me was he said he had the baby in his arms here with his head over here, and he rocked the baby back and forth and told me that's how he done it. He may have done it too fast, but that's how he demonstrated to me that he was shaking the baby.

Q. And is this something you would call shaking the baby?

A. Not that, no sir.

---

[7] Tryon testified, "When [appellant] said he shook the baby, he put his hands up in the air and shook."

[8] The prosecutor described Warner's demonstration for the record, "And for the record, you've got your arms kind of folded in front of you and you're saying the head would have been on maybe the crux of an elbow."

Q.      What would you call it as somebody in the child abuse unit?

A.      I don't think we have a specific term for that.  I mean, it's cradling a child basically when you're holding them like that.

Another counselor, who had several counseling sessions with appellant, Jane McCarty, testified to appellant's demonstrations and statements that appellant made to her approximately six months after S.M. was hospitalized.  She testified that she expected appellant to know how S.M.'s injuries occurred because S.M. had "incredibly serious injuries" and that he seemed to know when the injury occurred, but that appellant at times continued to deny that S.M. was injured or to tell her that the injuries must have been from S.M.'s birth or that the doctors were lying.  She also demonstrated to the jury how appellant showed her he shook S.M. and testified "[appellant] went like this and the baby's head went back and forth."[9]

Lindsey Lanham, a conservatorship worker for the Department, who was assigned to S.M.'s case for approximately one year, starting in October 2004 when S.M. was in the pediatric intensive care unit, testified that appellant's explanation of how S.M. was injured changed over time:

> Well, throughout the course of my time working with the family the story was inconsistent, it would change throughout. [Appellant] offered a couple explanations. When we first began the case, [appellant] didn't believe the child was injured.  Then he also indicated that maybe he moved the child a little too much but thought that the broken ribs were due to excessive crying.

---

[9]  The prosecutor stated for the record, "the witness held the baby up above her head and shaken [sic] until the head rocked back and forth."

Lanham testified that both children were placed in protective custody in October "because of the severity of S.M.'s injuries"—S.M. was found to have "traumatic nonaccidental injuries."[10]

Appellant testified in his own defense and demonstrated for the jury what he did to try to stop S.M.'s crying.[11] He denied that he "shook" S.M. Appellant's defense was that appellant's brother, who was no longer in the country at the time of the trial, was the person that injured S.M. Appellant testified to his brother's abnormal behavior and that his brother was living with his family when S.M. was injured. He also testified that, alternatively, his daughter could have been the one that injured S.M. Calvin Lee, a criminal investigator, testified that appellant's brother was a possible suspect that the police should have investigated.

At the charge conference, the State asked the court to also include the lesser included offense of reckless injury to a child, and the court granted the request over appellant's objection. The jury returned a verdict of guilty of the lesser included offense and assessed punishment. This appeal followed.

**ANALYSIS**

In his first two points of error, appellant contends that the evidence is legally and factually insufficient to support his conviction for reckless injury to a child. *See* Tex. Penal Code

---

[10] Appellant's wife voluntarily relinquished custody, and appellant's parental rights were terminated at a hearing that he failed to attend. Appellant testified that he did not attend the hearing because he was out of town trying to raise money for his attorney's fees.

[11] Appellant's physical demonstration to the jury is not described on the record. He testified: "I got him and I put his head right here and his feet right here and I was doing this"; "And I was doing this. He didn't stop. So I flipped him over and I was doing like this"; and "So I'm like well, what to do. To call my wife? And try again. He won't take anything. So I got him again and I flip him over like this." He testified that [S.M.] stopped crying after appellant left him on the couch.

7

Ann. § 22.04(a)(1), (e).[12] Appellant contends that there was no evidence to support that appellant had the culpable mental state of recklessness because there was "absolutely no evidence" that "appellant was aware of any risk to the child when he shook or rocked the baby" and "[n]o evidence was adduced from the experts that any reasonable human being would know that shaking or rocking a baby could injure the child."

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (legal sufficiency); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency).

In assessing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond

---

[12] Subsections 22.04(a)(1) and (e) of the penal code read:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, recklessly by omission, causes to a child, elderly individual, or disabled individual:

　　(1) serious bodily injury; . . .

(e) An offense under Subsection (a)(1) . . . is a felony of the first degree when the conduct is committed intentionally or knowingly. When the conduct is engaged in recklessly, the offense is a felony of the second degree.

Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp. 2007).

a reasonable doubt. *Williams*, 235 S.W.3d at 750 (citing *Jackson*, 443 U.S. 307). In reviewing the factual sufficiency of the evidence, we view the evidence in a neutral light to determine whether the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or whether the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.2d 404, 414-15 (Tex. Crim. App. 2006).

Injury to a child is a result-oriented offense requiring a culpable mental state which relates not to the specific conduct but to the result of the conduct. *See Williams*, 235 S.W.3d at 750; *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985).[13] Section 6.03 of the penal code defines the culpable mental state of recklessness:

---

[13] The court of criminal appeals in *Williams* listed the relevant factors that the factfinder must examine in addressing the culpable mental state of recklessness:

(1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;

(2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others")[;]

(3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and

(4) the defendant consciously disregarded that risk.

*Williams v. State*, 235 S.W.3d 742, 755-56 (Tex. Crim. App. 2007) (internal footnotes omitted).

A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c) (West 2003). "[A]t the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct[.]" *Williams*, 235 S.W.3d at 751 (quoting *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)). "Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Id.*

Culpable mental state is generally proven by circumstantial evidence. *Lopez v. State*, 630 S.W.2d 936, 942 (Tex. Crim. App. 1982); *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978); *Bowden v. State*, 166 S.W.3d 466, 476 (Tex. App.—Fort Worth 2005, pet. ref'd). To determine culpability for an offense, a jury is entitled to consider events before, during, and after the commission of the offense. *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.). Culpability may be inferred from the acts, words, and conduct of the accused, including inconsistent statements made by the accused, the extent of the injury to the victim, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Kelley v. State*, 187 S.W.3d 761, 763 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *Bowden*, 166 S.W.3d at 476 (holding that jury entitled to consider inconsistent statements as proof of guilt in prosecution for reckless injury to a child). In determining recklessness, "whether one is aware of a requisite risk or simply should be aware of it, is a conclusion to be drawn through inference from all the circumstances by the trier of fact." *Dillon*, 574 S.W.2d at 94.

10

Viewed in the light most favorable to the jury's finding of recklessness, the evidence showed: (1) S.M.'s injuries were non-accidental, "life-threatening," and that "high energy violent forces" caused S.M.'s injuries, (2) S.M. was an infant and appellant was S.M.'s sole caretaker at the time S.M. was injured, (3) appellant violently shook S.M., and (4) appellant's demonstrations of what he did to S.M. were not consistent with the extent of S.M.'s injuries. Appellant, at times, denied that S.M. was injured, urged that the doctors and others were not telling the truth, and was inconsistent in describing and demonstrating what he did to S.M. to try to stop S.M.'s crying, whether it was "patting," "rocking," "cradling" or "shaking." Dr. Hillary Onan, who examined S.M. on October 4 and testified to S.M.'s injuries, opined that appellant's various demonstrations to different individuals were not consistent with S.M.'s injuries. An investigator for the Department, Candice Tovar, testified that "shaking" a baby was not normal behavior. Viewed in the light most favorable to the verdict, from the expert testimony and facts surrounding the event, a rational jury could have inferred that appellant was aware of, but consciously disregarded, the risk of serious bodily injury to S.M. when he shook S.M. We overrule appellant's first point of error.

We also conclude the evidence was factually sufficient to support the jury's finding of recklessness. Viewed in a neutral light, contrary evidence included appellant's demonstrations and testimony that he only rocked S.M., appellant's wife's testimony that she did not believe that appellant had injured S.M., and appellant's testimony that appellant's brother, or alternatively, his daughter caused S.M.'s injuries. Appellant, however, testified that he did not inform the police or anyone at the Department that he believed his brother caused S.M.'s injuries prior to trial, and appellant and his wife consistently told the Department and the police that appellant's brother did

11

not take care of the children, that they did not leave the children alone with the brother, and that appellant was the sole caretaker of S.M. at the time of S.M.'s injuries.[14]

As to appellant's testimony and demonstrations that he did not shake S.M., there was evidence that S.M. was a difficult baby and that appellant was "very frustrated" and that he felt "like his head was going to explode" when S.M. was crying uncontrollably and when appellant shook him. There was also evidence that appellant shook his wife in front of Tovar. Tovar testified that she arranged a visitation for appellant and his wife with F.M., and that before F.M. arrived for the parental visit, that appellant's wife was crying and appellant "shook" her and "[i]t was a pretty aggressive shake."[15] In contrast, appellant testified that his actions directed at his wife prior to the

---

[14] Appellant's expert Lee discredited appellant's theory that appellant's brother or daughter caused S.M.'s injuries during cross-examination:

Q. If a person believed that their brother did it, wouldn't you have expected them to tell the police who would then do an investigation and do whatever charges followed [sic]?

A. I would have expected it, yes.

* * *

Q. Okay. Now, [appellant] also testified that he thinks maybe [F.M.], the four-year-old, could have hurt the baby.

A. I don't know. I wasn't here when that testimony occurred.

Q. Well, I'm about to ask you. Do you think that that seems like a logical conclusion?

A. Of course not.

[15] Appellant testified that he did not shake his wife, but that he "push" her—"Everyone confuse shaking. Even shake my wife but I don't shake my wife." Appellant and his wife were natives of Albania, and one of appellant's defenses was that he was misunderstood by various people who interviewed him because of language barriers.

visitation were "a push or kind of touching." From appellant's characterization at trial of his conduct directed at his wife and his inconsistent statements and demonstrations of what he did to S.M., the jury could have inferred that his testimony was not believable as to the amount of force he used against S.M. and that appellant was aware of, but consciously disregarded, the risk of serious bodily injury to S.M. when he shook S.M. We conclude that the evidence supporting the jury's finding that appellant was reckless is not so weak, or so outweighed by contrary evidence, as to be clearly wrong and manifestly unjust. We overrule appellant's second point of error.

In his third point of error, appellant contends that the trial court erred by instructing the jury on the lesser included offense of reckless injury to a child.[16] There is a two-part test for determining if an instruction on a lesser included offense should be given: (1) the lesser offense must be included within the proof necessary to establish the offense charged, and (2) there must be some evidence that would permit the jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993). Appellant challenges the second prong of the test "because there was no evidence adduced during the trial that would have permitted a rational jury to find that if appellant was guilty, he was guilty only of the lesser included offense of reckless injury to a child."

---

[16] The State contends that appellant did not preserve his third point of error because his complaint on appeal does not comport with his objections at trial. During the charge conference, appellant objected to the lesser included offense instruction "based on two facts. First, we were not given a fair chance to plea bargain at time of plea bargain. And secondly, because of misleading and perjury in front of the Grand Jury." In order for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for the objection, and an objection stating one legal basis may not be used to support a different legal theory on appeal. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990).

We conclude that the trial court did not err in instructing the jury on the lesser included offense as an alternative to the charged offense. There was some evidence which would permit a rational jury to find appellant guilty only of the lesser offense of reckless injury to a child. Appellant denied intentionally hurting S.M. According to McCarthy, appellant told her, "I didn't want to hurt [S.M.] and I didn't do it on purpose." Appellant admitted that he possibly moved or shook S.M. too much, and the expert evidence was that S.M.'s injuries were caused by violent force. This evidence was some evidence that supports the inference that appellant perceived but consciously disregarded the risk of serious bodily injury caused when he shook S.M. We overrule appellant's third point of error.

## CONCLUSION

Having overruled appellant's points of error, we affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: April 9, 2008

Do Not Publish

14