

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00127-CR

_____

KEVIN PAUL ENGLISH, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Red River County, Texas
Trial Court No. CR02715

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Pursuant to a plea agreement with the State, Kevin Paul English pled guilty to aggravated assault with a deadly weapon. The trial court deferred a finding of guilt and placed English on deferred adjudication community supervision for ten years. On June 9, 2025, the State moved to adjudicate English guilty, alleging, among other things,[1] that English committed the offense of injury to a child.[2] English pled not true to the State's allegation. After a hearing on the matter, the trial court found the State's allegation to be true, it adjudicated English guilty of aggravated assault with a deadly weapon and sentenced him to ten years' confinement in prison.

English appeals the trial court's judgment of conviction, arguing that the trial court abused its discretion when it found that he violated a condition of his community supervision by committing the offense of injury to a child. Upon our review of the record and the applicable law, we find no abuse of discretion on the trial court's part. We affirm the trial court's judgment.

## I.    Background

During the hearing on the State's motion to revoke English's deferred adjudication, English's son, M.E.,[3] testified that, prior to the altercation with English, he had been "jacking around" with his younger brother, Z.E. M.E. conceded that he hit Z.E. in the back of the head, but he also explained that Z.E. "popped [him] in the back of the head [earlier that day] and later on that day [M.E.] popped [Z.E.] in the back of the head." According to M.E., the brothers never

---

[1]The State also alleged several other allegations that are not relevant to the issue before us.

[2]Prior to the August 12, 2025, hearing, the trial court modified the conditions of English's deferred adjudication community supervision on at least two occasions due to English's inappropriate actions.

[3]We use initials to protect the identities of individuals who were minors at the time of the incident. *See* TEX. R. APP. P. 9.10(a)(3).

2

meant to cause any harm to one another. M.E. testified that English did not see the incident between the two brothers but that Z.E. told English about it.

M.E. stated that after English learned of the brothers' skirmish, he took M.E. and Z.E. "out to the truck and told [them] to fight." M.E. said that English wanted the brothers to hurt one another. The brothers told English that they were not going to fight, at which point, M.E. testified that Z.E. told English "to do something, like to whoop [M.E.], and [English] whooped [M.E.] twice and then [English] grabbed [M.E.] by the throat and pushed [him] up against the truck and headbutted [him]." M.E. testified that English kept his hands around M.E.'s throat for "probably three seconds" before English let go of him. According to M.E., it was not unusual for English to hit him with a belt. In addition, M.E. testified that English was "so mad" at him that day "because [English] was drinking." M.E. believed that English had been drinking "something like" a margarita and that it was not unusual for M.E. to see English drinking beer. M.E. explained that after English headbutted him, "[a] ball grew up on [his head], kind of like" a "big goose egg" and that he cried because it hurt. He also explained that his head hurt "[f]or probably three weeks" and that he was not able to wear a baseball cap because it hurt when he tried to put it on. According to M.E., Z.E. ran back into the house after English grabbed M.E. by the throat, so M.E. was not sure if Z.E. witnessed English's actions.

In addition, M.E. believed that when Z.E. ran into the house, he told English's girlfriend, Dana Morris, what happened. Although Morris worked for Child Protective Services, she did not contact the police. Believing that English's actions of grabbing his throat and headbutting him went beyond discipline, M.E. called his mother to tell her what English had done. In

response, his mother called the police, who, in turn, went to the scene. Upon his arrival, M.E. reported his version of events to Mike Taylor, a deputy sheriff for the Red River County Sheriff's Office (RRCSO). M.E. also showed Deputy Taylor the injury to his head. M.E. testified that he did not think anything was wrong with English spanking him, but that he did believe that English was wrong for headbutting him.

On cross-examination, M.E. was shown a photograph that had been taken of him the day of the incident and conceded that it did not show any marks on his neck. But M.E. also explained that the photograph was taken "many hours" after English grabbed him around the neck. M.E. acknowledged that there were no marks on his neck when Taylor arrived at the scene. M.E. testified that when English started to spank him, English was holding M.E.'s wrist and that the two of them were "going in a circle." Yet, he disagreed with the assertion that "[t]hat's when [their] heads collided, right?" M.E. also disagreed with the claim that the injury occurred "during th[e] spanking incident." M.E. was then faced with the question, "So you're saying later your dad just flat-out just headbutted you?" M.E. responded, "He -- after he whooped me he grabbed me by my throat, pushed me up against the truck and then he headbutted me."

Z.E. also testified. Z.E. admitted that he hit M.E. before M.E. hit him. Z.E. also explained how English decided to spank M.E., stating, "[English] brought us out to the trailer and then he was talking to us and then he was, like, how many whoopings do you want me to give to your brother. [Z.E.] said, like, two I think. And then [M.E.] was trying to tell his story" about Z.E. hitting him on the head earlier that day and that M.E. was merely "defending

4

himself." But before M.E. was able to justify his actions, "[D]ad just hit him twice with a belt." Z.E. explained that he went to get Morris because English "just like started hitting [M.E.] anywhere he could with the belt." Although Z.E. said that he was not present when English grabbed M.E.'s neck and headbutted him, he described M.E.'s injuries as "like a big knot, like right here." In addition, Z.E. stated that M.E. was not trying to block English's hand when English was attempting to spank him; instead, M.E. was trying to tell English that he would not bend over and that the reason he hit Z.E. was because Z.E. hit him earlier that day. Also, Z.E. testified that he did not see any marks on M.E.'s neck and that M.E. was a "pretty big boy."

Lastly, Z.E. testified that "[b]ecause [English] was drinking that day . . . [Z.E.] didn't know what was going to happen." Z.E. said that English became mean when he drank alcohol. According to Z.E., on the day of the incident, English was "getting out of control," and Z.E. was afraid for M.E.

The body-camera recording of Deputy Taylor's conversation with English regarding the incident was admitted into evidence. English told Deputy Taylor that he was having a good day until Z.E. came running in saying that M.E. "done slapped him upside the head and hurt him." English told the boys to go out to the trailer because he was going to "bust both of [them]." English said that, when he tried to spank M.E., M.E. was not "gonna take it." According to English, M.E. would not turn around when he was trying to "bust" him, and when English turned around, M.E. "got right in [his] face" and that was when they headbutted one another. English told Taylor, "I mean I didn't mean to." English also said, "I know I hit him" because M.E. "was bruised up." English said that the incident, which lasted about three minutes, occurred because

5

he was attempting to discipline M.E. for hitting Z.E. At that point, Deputy Taylor told English that "discipline [wa]s discipline," and from what English had told him, it sounded like he was attempting to discipline M.E. English also claimed that M.E. was bigger than he was.

Deputy Taylor also testified during the hearing. He explained that when he responded to the incident, he informed English that the RRCSO received a call about "a juvenile possibly being struck." Deputy Taylor had also been informed that M.E. had been headbutted. Deputy Taylor said that when he spoke to English about the incident, he stated that English referred to it as "[a] mess up, a mistake." In addition, Deputy Taylor testified that he "was going along" with English's claim that he was merely disciplining M.E in order to keep English calm. Furthermore, Deputy Taylor said that the first thing he noticed when he saw M.E. "was the goose egg on his head." Deputy Taylor explained that he was surprised by the extent of the injury because when he spoke with English, "it kind of sounded like they just kind of butted heads. [Taylor] . . . wasn't expecting [it] . . . to protrude and then be as big as it was." Deputy Taylor did not see any marks on M.E.'s neck, but he said that M.E. told him that "his father had held him by his neck against a truck when he headbutted him." After seeing M.E.'s injuries and based on English's statements, Deputy Taylor determined that he needed to get an arrest warrant for English.

On cross-examination, Deputy Taylor conceded that he did not see any red marks on M.E.'s neck. When asked if he was "a trained biomechanical engineer so that [he could] view that bruise and determine whether it was some intentional act or simply a collision between two heads," Deputy Taylor said he was not. Deputy Taylor did not believe English was intoxicated

6

that day, and he did not see any evidence that English had been drinking. Deputy Taylor also testified that neither of the children said anything to him about English drinking alcohol that day. Referring to the children's failure to mention that English had been drinking alcohol that day, Deputy Taylor said he was not surprised when a "story grows a little bit [in court] from what somebody tells you on the day it happened." He further stated, "It's kind of expected."

Morris testified that she was at the house the day of the incident, but she did not witness English spank M.E. Likewise, Morris said that she did not see English drink any alcohol and that she did not call the Department's hotline to report the incident between English and M.E.

## II.     Standard of Review

A trial court's determination to proceed with an adjudication of guilt after a defendant is placed on deferred adjudication community supervision "is reviewable in the same manner as a revocation hearing." TEX. CODE CRIM. PROC. ANN. art. 42A.108(b). "At a revocation hearing, the State must prove by a preponderance of the evidence that a condition of community supervision has been violated." *Perry v. State*, 367 S.W.3d 690, 693 (Tex. App.—Texarkana 2012, no pet.); *see Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). When the greater weight of the credible evidence before the trial court supports a reasonable belief that a defendant violated the terms of his community supervision, the preponderance of the evidence standard has been met. *Rickels v. State*, 202 S.W.3d 759, 763–64 (Tex. Crim. App. 2006).

During a hearing on the State's motion to revoke community supervision, the trial court is the sole fact-finder and the judge of the credibility of the witnesses and the weight to be given to their testimony. *Taylor v. State*, 604 S.W.2d 175, 179 (Tex. Crim. App. [Panel Op.] 1980)

7

(citing *Battle v. State*, 571 S.W.2d 20 (Tex. Crim. App. [Panel Op.] 1978)). When the State meets its burden of proof and no procedural obstacle has been raised, it is within the trial court's discretion whether to revoke a defendant's community supervision. *Flournoy v. State*, 589 S.W.2d 705, 708 (Tex. Crim. App. [Panel Op.] 1979). As a result, an appellate court's review of a trial court's decision to revoke a defendant's community supervision is limited to determining whether the trial court abused its discretion. *Clerkley v. State*, 515 S.W.3d 331, 332 (Tex. App.—Tyler 2015, no pet.) (citing *Cardona*, 665 S.W.2d at 493). If there is some evidence to support the finding of even a single violation, the revocation order must be upheld. *Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. [Panel Op.] 1980).

## III. Discussion

In this case, the State was required to prove by a preponderance of the evidence that English acted "intentionally, knowingly, recklessly, or with criminal negligence," causing bodily injury to M.E., who was a child fourteen years of age or younger at the time of the incident. *See* TEX. PENAL CODE ANN. § 22.04(a)(3), (c)(1) (Supp.). "'Bodily injury' means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (Supp.). "Injury to a child is a result-oriented [crime that] require[es] a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Furthermore, recklessly is defined as follows:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

8

TEX. PENAL CODE ANN. § 6.03(c); *see also Williams*, 235 S.W.3d at 750. "Mental culpability usually must be inferred from the circumstances of the act or words." *Kelley v. State*, 187 S.W.3d 761, 763 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998)). "It may also be inferred from the extent of the injuries and the [parties'] relative size and strength . . . ." *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see Kelley*, 187 S.W.3d at 763. "The extent of a victim's injuries is a reflection of the strength of a defendant's attack and therefore involves the defendant's conduct." *Kelley*, 187 S.W.3d at 763.

English raised the defense of justification, claiming that he was, as a father, reasonably disciplining M.E. in response to M.E. hitting Z.E. on the head. *See* TEX. PENAL CODE ANN. § 9.61(a). Section 9.61(a)(2) of the Texas Penal Code states, in part, that a parent is justified in "us[ing] force, but not deadly force, against a child younger than [eighteen] . . . when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare." TEX. PENAL CODE ANN. § 9.61(a)(2). The Texas Penal Code defines "[r]easonable belief" as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42) (Supp.). A parent's use of force under Section 9.61(a)(2) is not justified simply based on their subjective belief, "rather, the use of force is justified only if a reasonable person would have believed the force was necessary to discipline the child or to safeguard or promote the child's welfare." *Quattrocchi v. State*, 173 S.W.3d 120, 122 (Tex. App.—Fort Worth 2005, pet. ref'd) (emphasis omitted) (quoting *Assiter*

9

*v. State*, 58 S.W.3d 743, 748 (Tex. App.—Amarillo 2000, no pet.)). In other words, "reasonable belief" is an objective standard. *Id.* (citing TEX. PENAL CODE ANN. § 1.07(a)(42)).

English argues that "the State was thus required to prove by a preponderance of the evidence [that he] committed an offense and disprove by the same standard that Appellant did not reasonably believe the force Appellant used was necessary to discipline the child or safeguard or promote his welfare." In support of his contention, English cites *Warren v. State*, 614 S.W.3d 441, 446 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). In that case, which involved a jury trial, not a revocation proceeding, Warren argued that "the State failed to disprove an element of intent contained within the Justification Defense." *Warren*, 614 S.W.3d at 447. The Houston Court of Appeals noted that when a defendant meets his burden of proof in support of a justification defense, the State is required to disprove it. *Id.* at 446. The Houston Court of Appeals stated,

> Specifically, [appellant] complains that testimony describing some of appellant's conduct as improper, namely the baton instructor's testimony that some of appellant's latter baton strikes were inappropriate, does not constitute evidence that appellant intended to assault [complainant] in a way that was not justified. Appellant also seems to suggest that the State had to provide direct testimony that "appellant intended to commit an assault" or some crime, or otherwise do something unlawful. Appellant does not provide legal support for these assertions, and our own research reveals none.
>
> The Justification Defense only protects appellant's use of force against [complainant] when and to the degree that appellant reasonably believed that such force was immediately necessary to make or assist in making an arrest or search. *See* Tex. Pen[al] Code Ann. § 9.51(a). A "reasonable belief" is not whatever appellant believed; rather, according to the statute, it is "a belief that would be held by an ordinary and prudent man in the same circumstances as [appellant]." TEX. Penal Code [Ann. §] 1.07(42). In this context, the term "ordinary and prudent man" means "ordinary and prudent person." *See Mays v. State*, 318

10

> S.W.3d 368, 385 (Tex. Crim. App. 2010); *Bell v. State*, 566 S.W.3d 398, 402
> (Tex. App.—Houston [14th Dist.] 2018, no pet.).

*Id.* at 447 (fifth alteration in original).

In this case, the defense of justification only protects English if he had a "reasonable belief" that his actions were necessary to discipline M.E. in the manner he did. *See* TEX. PENAL CODE ANN. § 1.07(a)(42). That "reasonable belief" is based on an ordinary and prudent person's belief and not on English's own belief. *Id.* English seemingly argues that the State was required to disprove that English did not have a reasonable belief that his actions were necessary to discipline M.E. in the manner he did. As we understand it, English's argument appears to be based on his own belief or nonbelief as to whether the actions he took were reasonably necessary to discipline M.E., meaning a subjective standard. Because the standard of "reasonable belief" is an objective standard, English's argument is without merit.

Moreover, "[t]here are rational limits to the Justification Defense." *Warren*, 614 S.W.3d at 447 (citing *Ryser v. State*, 453 S.W.3d 17, 27 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). For instance, "[i]f an officer uses more force than is reasonably necessary, [the officer] exceeds [the officer's] statutory authority and may be subject to criminal liability." *Id.* (second and third alterations in original) (quoting *Ryser*, 453 S.W.3d at 27). The same is true of a parent disciplining his child.

That said, when determining whether English's actions were justified and, therefore, a defense to the offense of injury to a child, as the sole judge of the weight and credibility of the evidence, the trial court could have given significant credence to M.E.'s version of events; that is, that English grabbed M.E. by the neck, shoved him up against the truck, and purposefully

11

headbutted him. From that testimony, the trial court could have inferred that English acted, at the very least, recklessly based on the determination that an ordinary person would reasonably believe that when an adult spanks a child with a belt "anywhere he could," grabs the child by the neck and headbutts him, there is a substantial and unjustifiable risk that the child will incur bodily injury. In addition, there was testimony from multiple witnesses that English's actions caused a rather substantial injury to M.E.'s forehead, which was referred to as looking like a "big goose egg." From that testimony, the trial court could have determined that English exerted more force over M.E. than was necessary to discipline him for hitting Z.E. on the head as payback for Z.E. hitting M.E. on the head. And although English told Deputy Taylor that M.E. was bigger than he was, the fact remains that one of the participants in the incident was a fourteen-year-old boy while the other was a grown man and the father of that fourteen-year-old boy. The trial court could have determined that a fourteen-year-old boy was at a distinct disadvantage when he is in the middle of being physically assailed, justified or not, by his father. Moreover, M.E. and Z.E. both testified that English had been drinking that day and when English drank, he became angry or mean. The trial court was within its discretion to infer from the boys' testimony that English might have subjectively believed that his actions were justified but that an ordinary and prudent person would not reasonably believe his actions were justified.

In sum, the State met its burden of showing, by a preponderance of the evidence, that English recklessly caused bodily injury to M.E., a child who was fourteen years old or younger. Therefore, the trial court did not abuse its discretion when it (1) found that English violated one of the terms of his deferred adjudication community supervision, (2) revoked English's deferred

adjudication community supervision, (3) adjudicated English guilty of aggravated assault with a deadly weapon, and (4) sentenced English to ten years' confinement in prison.

We overrule English's sole point of error.

## III. Conclusion

We affirm the trial court's judgment of conviction.

Scott E. Stevens
Chief Justice

Date Submitted:     March 30, 2026
Date Decided:       June 5, 2026

Do Not Publish