Matthew David **KELLEY**, Appellant

v.

The **STATE** of Texas, Appellee.

No. 14–04–00485–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 28, 2006.

Perry R. Stevens, Angleton, for appellants.

Jeffrey Douglas Kyle, Pearland, for appellees.

Panel consists of Justices HUDSON, EDELMAN, and SEYMORE.

## MAJORITY OPINION

J. HARVEY HUDSON, Justice.

Appellant, Matthew David Kelley, appeals his conviction for recklessly causing serious bodily injury to a child. Appellant was sentenced following a jury trial to eight years' confinement and a $2500 fine. In two points of error, appellant challenges the legal sufficiency of the evidence to support his conviction. We affirm.

On May 31, 2002, appellant's three-month-old daughter was left in his care while her mother, Nicole Williamson, was at work. When Williamson left for work, the baby was sleeping in her crib. That afternoon, Williamson called home to check on the baby. Appellant said the baby seemed groggy and tired, but told Williamson she did not need to come home. Later that day, appellant called Williamson and told her he was changing the baby's diaper and sat her up on the changing table. When he reached for a diaper, the baby slumped over on the changing table. The baby then cried, gasped for air, and arched her back. Appellant noticed after he changed her diaper, the baby's jaw was tight and her tongue was pushed to the roof of her mouth. Appellant called Williamson and asked her to come home.

Williamson arrived approximately five minutes later and took the baby to the pediatrician's office. The pediatrician examined the baby and decided to transfer her by ambulance to the University of Texas Medical Branch (UTMB) in Galveston. At the hospital the baby was admitted to the pediatric intensive care unit. Dr. Frances Nesti examined the baby when she arrived at the hospital and testified that when she arrived, the baby was non-responsive. While in the pediatric intensive care unit, the baby became less responsive and stopped breathing for periods of time, so she was intubated. Dr. Nesti noted the baby had a bruise on her face and small bruises on her ears. A CT scan revealed a subdural hematoma, which the doctor described as bleeding in the brain. Dr. Nesti testified that when a three-month-old has a subdural hematoma, it is almost uniformly caused by shaken baby syndrome. Other diseases or disorders in a child that age would result in other forms of bleeding or injury, not subdural hematoma. Dr. Nesti stated the hematoma and the retinal hemorrhages could not have happened as a result of the child falling approximately one foot while sitting on the changing table and hitting her head as described by appellant.

Dr. Charlise Gunderson is a pediatric ophthalmologist who examined the baby in the hospital. Dr. Gunderson found bleeding in all four quadrants and all three layers of both of the baby's eyes. The hemorrhages found in the baby's eyes were so numerous that they were not due to a minor trauma, such as slumping and hitting her head on a changing table. Dr. Gunderson also testified that any hemorrhages due to birth trauma would be gone by the time the baby was six weeks old. Dr. Gunderson ruled out several possible diseases or disorders that could have caused the bleeding and determined the bleeding in the eyes was caused by a "fairly severe trauma." The pattern of hemorrhaging aided Dr. Gunderson in determining the cause of the retinal bleeding. Dr. Gunderson testified that the most likely cause of the pattern of retinal hemorrhaging found in the baby's eyes was a shaking type of injury or a severe blow to the head.

Dr. Leonard Swischuk, director of pediatric radiology at UTMB, testified that absent a disease, bleeding disorder, or external trauma, the cause of the subdural hematoma was shaking. Dr. Swischuk testified that if the baby's injuries had been caused by a fall, the fall would have

had to have been from a great distance to cause the subdural hematoma and retinal hemorrhages. An accidental injury of that nature most likely would have produced a hematoma on the outside of the baby's head and possibly a skull fracture. Dr. Swischuk testified that a single recent event caused the baby's injuries. When a baby is shaken, the veins in the subdural space tear and cause bleeding in the brain and the eyes.

■ In his first point of error, appellant argues there is legally insufficient evidence to support a conviction of injury to a child by shaking the child. Specifically, appellant contends the State failed to show the force necessary to cause the injury was of such force to show appellant knew his actions could cause injury to the child or that he consciously disregarded the risk to the child.

In a legal sufficiency review, we consider all the evidence in a light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App.2004). In conducting this review, we do not engage in a second evaluation of the weight and credibility of the evidence, but ensure only that the jury reached a rational decision. *Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App.2000).

■ A person commits the offense of injury to a child if he recklessly, either by act or omission, causes serious bodily injury to a child fourteen years or younger. Tex. Penal Code Ann. § 22.04(a)(1) (Vernon Supp.2005). A person acts recklessly if he is aware of, but consciously disregards a substantial and unjustifiable risk. Tex. Penal Code Ann. § 6.03(c) (Vernon 2003). Injury to a child is a result-orient-

ed crime. *Alvarado v. State,* 704 S.W.2d 36, 39 (Tex.Crim.App.1985). That means the culpable mental state relates to causing the result rather than merely engaging in the conduct. *See Cook v. State,* 884 S.W.2d 485, 490 (Tex.Crim.App.1994). Mental culpability usually must be inferred from circumstances of the act or words. *Moore v. State,* 969 S.W.2d 4, 10 (Tex. Crim.App.1998). It may be inferred from the extent of injury and the relative size and strength of the parties. *Patrick v. State,* 906 S.W.2d 481, 487 (Tex.Crim.App. 1995). The extent of a victim's injuries is a reflection of the strength of a defendant's attack, and therefore, involves the defendant's conduct. *Moore,* 969 S.W.2d at 16, n. 5 (Keller, J. concurring and dissenting).

Appellant contends his conviction is not supported by legally sufficient evidence because the State failed to introduce evidence that would show the conduct necessary to cause the trauma. Appellant argues the medical experts did not testify as to what amount of force, either specifically or generally, could cause shaken baby syndrome. To the contrary, three medical experts testified that the baby's injuries could not have been caused by a minor accident. Dr. Gunderson testified the cause of the retinal bleeding was a "fairly severe trauma," or a "severe blow to the head." Dr. Swischuk testified that for the baby's injuries to be accidental would have required a fall from a great distance. Dr. Nesti testified that had the baby not been taken to the hospital immediately, she most likely would not have lived.

Appellant contended at trial that the baby's injuries were either accidental or caused during a traumatic forceps delivery, which resulted in bruising on the right side of her head. Both theories were discredited by the expert testimony. Every expert testified that the baby's injuries

could not have been caused by the accident on the changing table as described by appellant. Further, Dr. Gunderson testified that any hemorrhages due to birth trauma *would be healed within six to ten weeks of* birth.

If any rational juror could find the elements of the offense beyond a reasonable doubt when viewing the evidence in the light most favorable to the verdict, the verdict will be upheld in a legal sufficiency review. *Lacour v. State,* 8 S.W.3d 670, 671 (Tex.Crim.App.2000). In determining whether appellant's conduct was reckless, the jury was entitled to consider the extent of the baby's injuries, the relative size of a three-month-old baby compared to appellant, and the expert testimony that a severe trauma was the cause of the baby's injuries. From the expert testimony and the facts surrounding the event including the relative size and strength of the parties and the fact that appellant was alone with the baby, a rational juror could have found appellant was aware of, but consciously disregarded, the risk to the baby. Appellant's first point of error is overruled.

In his second point of error, appellant argues the evidence is legally insufficient to support a conviction of injury to a child by causing the child to strike an object unknown to the grand jury. Because we have found the evidence legally sufficient to support appellant's conviction for injury to a child caused by shaking the child, we need not address whether the evidence was sufficient to show the injury was caused by striking an object. Appellant's second point of error is overruled.

The judgment of the trial court is affirmed.

SEYMORE, J., dissenting.

CHARLES W. SEYMORE, Justice, dissenting.

Because the evidence is legally insufficient to support appellant's conviction for recklessly causing serious bodily injury to a child, I respectfully dissent.

Significantly, the State did not introduce testimony from an expert in shaken baby syndrome or head trauma. Instead, the jury reviewed diagnostic information directly from a pediatrician, a radiologist, and an ophthalmologist concerning factors such as the baby's blood-clotting abnormalities and the location of the subdural hematoma. However, the jury was not qualified to evaluate the diagnostic information in relation to the force of the conduct that caused the injuries. Because the State failed to establish a forensic link between the baby's medical diagnosis and reckless conduct on the part of appellant, there is no evidence from which a rational jury could conclude beyond a reasonable doubt that appellant was aware of but consciously disregarded a substantial and unjustifiable risk.

At trial, the pediatrician testified that the baby presented with a coagulopathy. She further explained that three of the baby's coagulation factors tested outside the normal range and indicated a blood-clotting abnormality.[1] However, the jury was unable to evaluate the impact of the baby's coagulopathy on the amount of

1. The pediatrician specified the "D-dimer, the FDP, and the fibrinogen" as the abnormal clotting factors. She also testified that small bruises were found on the baby's cheek and left ear. When the baby's mother was questioned about the bruising, she said she thought "babies bruise easily." In addition, the baby was readmitted to the hospital approximately five weeks after the alleged child abuse when a follow-up exam revealed an "increased right subdural hematoma." The baby was in State custody at the time the subsequent bleeding occurred.

force likely to have caused the baby's injuries. At a voir dire hearing outside the presence of the jury, the pediatrician testified that she did not know the amount of force it would take to cause the baby's injuries. In describing the amount of force to cause shaken baby syndrome in general terms, she stated it was a rotational movement that caused the injury, which is why someone not very large or forceful could cause shaken baby syndrome. She stated repeatedly that it would not take much physical force to cause the syndrome. At the conclusion of the hearing, the judge ruled that he would not allow any type of demonstration or testimony from the pediatrician concerning the amount of force necessary for the baby to sustain her injuries.

No other expert testified as to the amount of force, either specifically or generally, that could cause shaken baby or shaken impact syndrome. The ophthalmologist and a local physician were not asked and did not address the question. The radiologist testified that he could not determine how much force it would take to cause an injury to the baby. When questioned about the baby's abnormal blood-clotting factors, the radiologist testified that the factors were "too much spaghetti" for him, and "the coagulopathy and what roll [sic] it plays in it is the clinician's job." As a general matter, however, he testified that in cases where a blood disorder is found, the trauma causing the bleeding

may be "less than it would be in a normal person."

Throughout the trial, the State's experts referred to Dr. Lukefahr, a specialist consulted in the case. Dr. Lukefahr was described by the State and the pediatrician as a UTMB specialist in shaken baby syndrome and expert in forensic medicine, but he was not called to testify.[2] On voir dire, the pediatrician stated that Dr. Lukefahr was the expert qualified to answer questions related to the force of conduct involved in shaken baby or shaken impact syndrome. At trial, she testified that the baby was referred to Dr. Lukefahr, and Dr. Lukefahr is routinely called for consultation when shaken baby syndrome is the suspected diagnosis.[3] At closing, the State argued that Dr. Lukefahr was not needed at trial because the jury had "the same information." However, unlike Dr. Lukefahr, the jury did not have the expertise to evaluate that information.

Both the pediatrician and the radiologist testified that the baby's records indicated that Dr. Lukefahr inferred from diagnostic information that the baby suffered a contusion and listed the baby's diagnosis as "shake-impact" syndrome.[4] The radiologist explained that when there was an impact, a contusion and skull fracture would typically appear on one side of the head, but a subdural hematoma would appear on the opposite side because "the brain gets compressed against the skull as it reverberates from the injury." He fur-

2. There was no indication in the record as to why the State did not call Dr. Lukefahr as a witness.

3. She further testified that per Dr. Lukefahr's request, among other things, the baby was tested for a rare inheritable disease with symptoms similar to shaken baby syndrome. However, she did not know the results of the test, and stated again that Dr. Lukefahr was the expert qualified to testify regarding the disease.

4. The record indicates that the terms "shaken impact syndrome" and "shaken baby syndrome" reflect two different schools of thought. With respect to shaken baby syndrome, the view is that shaking alone is enough to cause the injuries consistent with the syndrome. With respect to shaken impact syndrome, the view is that the shaking must be accompanied by an impact of some sort.

ther testified that shaken baby syndrome was usually more consistent with bilateral subdural hematomas or internal bleeding on both sides of the head. Here, the baby's CT and MRI scans revealed that she had a unilateral subdural hematoma located on the right side of her head. The radiologist testified that there was no evidence from which to infer a contusion or external trauma. Other experts also testified that there were no broken or fractured bones, burns, cuts, bruises, or any other evidence that indicated external trauma to the head.

Again, because Dr. Lukefahr did not testify and the State did not present testimony from another qualified expert in head trauma, the jury had no factual basis to evaluate the significance of the diagnostic findings relative to criminal liability. Specifically, the jury could not assess whether the location of the subdural hematoma and the absence of bone fractures or other symptoms associated with shaken baby syndrome were findings more consistent with injuries caused by violent shaking or injuries caused by movements within the normal range of conduct.

The majority holds that there is legally sufficient evidence to support appellant's conviction because the State's experts ruled out the possibility that the baby's injuries were caused by an "accident." On the day of the alleged offense, appellant called the baby's mother and told her that he thought they should take the baby to the doctor because "she seemed kind of like a passed-out state [sic]" and she "slumped over" on the changing table. However, appellant did not contend that the baby's injuries were caused when she slumped over on the changing table. Rather, appellant argued that the medical experts could not determine what caused the baby's injuries, or that the injuries were caused by re-bleeding from a trau-

matic forceps delivery that resulted in massive bruising on the right side of her head (the same side as the subdural hematoma).

Moreover, even if the jury viewed the State's evidence of appellant's statements as an exculpatory attempt, mere disbelief of exculpatory evidence does not relieve the State of its burden to prove all of the elements of the offense. *Gold v. State,* 736 S.W.2d 685, 689 (Tex.Crim.App.1987), *overruled in part on other grounds, Torres v. State,* 785 S.W.2d 824, 825 (Tex. Crim.App.1989). Here, the testimony as to appellant's statements revealed no inconsistencies which would indicate his statements were false. There is also no evidence that appellant attempted to conceal the baby's injuries from anyone or delay medical treatment. Nor is there evidence that appellant ever became angry or upset or lost control of his temper. To the contrary, the baby's mother testified that appellant denied doing anything to hurt the baby. She also testified that she and appellant both loved the baby, and she had never seen appellant shake or cause injury to the baby.

Because there was no evidence from which a lay person could infer that appellant recklessly caused the baby's injuries, the State could not prove its case without the testimony of an expert. In the absence of such testimony, the jury was unable to evaluate the significance of the diagnostic factors in relation to the physical force sufficient to cause the baby's injuries. Without this crucial link between medical diagnosis and criminal culpability, a rational jury could not find beyond a reasonable doubt that appellant recklessly caused the baby's injuries. Therefore, I would find the evidence legally insufficient to support appellant's conviction, reverse

the judgment of the trial court, and render a judgment of acquittal.