**Affirmed and Memorandum Opinion filed April 18, 2013.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-11-00945-CR

---

**JEFFERY NEIL MALNAR, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court
Harris County, Texas
Trial Court Cause No. 1253795**

---

## MEMORANDUM OPINION

Appellant Jeffery Neil Malnar, Jr., appeals his conviction of the state-jail felony offense of injury to a child by criminal negligence, challenging the sufficiency of the evidence to support his conviction and asserting the trial court erred in denying his challenge for cause to a veniremember. We affirm.

## BACKGROUND

Appellant was charged by indictment with the offense of felony murder based upon the commission of the offense of injury to a child through intentional, knowing, reckless, or criminally negligent conduct, resulting in the child's death. Appellant pleaded not guilty to the charged offense.

The record from trial reflects that the five-month-old child complainant and his mother Kendra had recently met appellant in Conroe, Texas, where appellant lived. According to the record, appellant spent a weekend with Kendra and the child in the maternal grandmother's home in Seabrook, Texas, around February 12, 2010. Kendra recalled being in the kitchen and hearing a "thump" on Friday or Saturday when appellant was in Kendra's room, holding the child. When Kendra investigated the sound, appellant indicated he had been rocking the child and the child hit his head on the wall. The child did not cry and did not appear to have signs of injuries. On the next morning, Sunday, February 14, the mother discovered the child was breathing heavily, acting lethargic, and had limp limbs. The child was taken to the hospital, where appellant was adamant about being with the child in the examination room and explained to doctors that the child had cried a lot in the night. The child was diagnosed with a urinary tract infection, prescribed antibiotics, and discharged. Appellant returned to his home in Conroe the next day.

The child continued to experience problems with vomiting, lack of appetite, and diarrhea. His eyes appeared to cross. He received medical care on February 16 at another area hospital, which diagnosed him with an abdominal infection and discovered that the child was previously misdiagnosed with a urinary tract infection. The child received follow-up care from his pediatrician two days later.

2

Although the child's eyes still remained crossed, he was active, ate well, and played.

On the weekend of February 26, 2010, appellant again visited the child and Kendra at the maternal grandmother's home. The record reflects that Kendra did not want appellant to visit that weekend because she wanted to talk with a former boyfriend, for whom she still had feelings. Several witnesses noted how attentive appellant was toward the child. On the evening of February 27, the child awoke and cried in the night and Kendra gave appellant a bottle to feed the child; Kendra went back to sleep. Kendra woke up an hour later and saw appellant attempting to delete something, perhaps text messages from the former boyfriend, from her cell phone. The following morning, Kendra woke up later and observed appellant holding the child and walking in and out of the bedroom several times; she then heard the child whimper and took the child in an attempt to comfort him back to sleep. Later on that morning, the child cried loudly and would not open his eyes or eat; the record reflects that he also had stopped breathing momentarily and was lethargic. Kendra took the child to a hospital, where she also spoke with a police officer. The child was transported by life flight to a children's hospital.

CT scan images taken at the children's hospital showed blood on the child's brain that was less than seven to ten days old, possibly only hours old. It also showed multiple areas of dead brain tissue. Some of the child's injuries may have been more than a few days and less than one month old. The child also presented with severe retinal eye damage and hemorrhaging, likely resulting from high-velocity head trauma akin to a high-velocity motor vehicle accident. One doctor opined that the retinal injury and bleeding on the child's brain was the result of being shaken with an amount of force so great that a reasonable person would have recognized it as harmful to the child.

3

Eventually Kendra learned that the child's skull was fractured; the child was unable to see, hear, or feed himself and began experiencing seizures. He remained in an intensive care unit for several weeks before he was transferred to another medical facility for rehabilitative care. Although the child was conscious and alert, he did not smile; he was blind and doctors had found blood in the back of the child's eyes. The child remained at a rehabilitative care home for a couple of weeks until his health declined again. The record reflects that the child was experiencing fevers and seizures that caused his brain to bleed more. He returned to a hospital and received hospice care until he died on May 11, 2010.

Autopsy reports reflect that the child died from complications following blunt force trauma to his head. A medical examiner opined that the child's symptoms of vomiting, diarrhea, decreased appetite, and lethargy—as exhibited at the hospitals on both February 14, 2010, and February 16, 2010—were consistent with brain injury. According to the medical examiner, the symptoms of lethargy, limp body, whining, and breathing irregularities—as exhibited at the hospital on February 28, 2010—were also consistent with brain damage. The medical examiner testified that the child had bleeding and cerebral spinal fluid in his brain, bruises to the front and back of the brain, and evidence of two skull fractures, one of which showed signs of healing. Based on the location of the fractures, the child sustained impact to the back of his head and to the left side of his head. The examiner opined that a minimum of two separate impacts to the child's head possibly occurred around February 14 and again on or before February 28 and that none of the injuries were caused by an illness or infection. An additional tibia fracture was also discovered; the medical examiner opined that the fracture was unlikely accidental given the child's age and abilities. By early March 2010, the child's brain had eventually swollen to the point that he had no blood flow,

4

indicative of brain death, and he died two months later. The medical examiner believed the child's death was a homicide. The medical examiner and a physician who treated the child ruled out hypothetical scenarios, involving a short fall of several feet or an accidental head-strike on a door frame, wall, door, or a crib rail, none of which would have caused a fatal fracture.

A law enforcement officer was assigned to the case on February 28, 2010, and spoke with a doctor who treated the child and interviewed family members. During the officer's interview with Kendra, appellant contacted Kendra multiple times by text or telephone; during one phone call, the officer informed appellant that he wanted to speak with him. Eventually, the officer met with appellant in a non-custodial interview. In a videotaped interview with appellant, the officer asked for more information about the child's condition, which the officer called an "accident." At first, appellant denied knowing anything that happened to the child that could have caused the child's injuries. During the recorded interview, which was played for the jury, appellant admitted that, on the weekend of February 14, 2010, the child hit his head on a wall, resulting in a sound loud enough to alert Kendra to investigate. When pressed for more information, appellant later stated that he had repeatedly gotten up in the night to help care for the crying child on February 28, 2010, and that he had bumped the left side and back side of the child's head into the door or door frame and that the child also had "wiggled" from appellant's grasp, fell, and hit the wooden crib rail, resulting in a "thump" loud enough to wake Kendra. Appellant did not inform others of what had happened even though the child required medical care following these incidents. Charges were subsequently filed against appellant.

Appellant called a forensic anthropologist, who assisted in the child's autopsy, to testify. She observed that the child had two skull fractures, which

5

suggested two separate impacts from non-accidental trauma. The anthropologist testified that the fractures likely occurred around February 28, 2010. She did not observe any tibia fracture, but she acknowledged the possibility that a fracture existed at one time and had healed significantly.

Appellant testified that he did not shake the child. He denied hitting the child on the head or anywhere else with any object. Appellant denied intentionally or knowingly hurting the child, claiming that he never dropped the child or threw him against a wall. Appellant testified to his remorse that he caused the child's head to strike "those things," but he asserted that he did not believe the child's injuries came from his conduct. Appellant testified that, while caring for the child during the night of February 27 and 28, 2010, there were two "head-bump incidents" that he did not tell Kendra about because they seemed "insignificant." Appellant confirmed that he had admitted to the officer that the child hit his head "pretty hard" in two of the "head bump" incidents. Appellant testified that when he returned to Conroe on February 28, 2010, he and his brother had an altercation in which he sustained a head injury; he was rendered unconscious and received medical care later that day. Although appellant knew to seek treatment for his own head injuries, he testified that he did not feel it was important to tell Kendra about the "head bump" incidents.

In its charge, the trial court instructed the jury regarding felony murder based on injury to a child through intentional, knowing, reckless, or criminally negligent conduct. The court also included an instruction on the lesser-included offense of bodily injury to a child by criminal negligence. The jury convicted appellant of the lesser-included offense. Appellant was sentenced to two years' confinement.

6

## I. Sufficient evidence supports appellant's conviction.

In his second issue, appellant challenges the evidence to support his conviction for the offense of bodily injury to a child by criminal negligence. In evaluating such a challenge, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The trier of fact "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The trier of fact may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

A majority of the judges of the Court of Criminal Appeals have determined that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim.

App. 2010) (plurality op.) (Hervey, J., joined by Keller, P.J., and Keasler and Cochran, JJ.); *id*. at 912–15 (Cochran, J., concurring, joined by Womack, J.) (same). Therefore, we will review the evidence under the *Jackson v. Virginia* standard as articulated in the preceding paragraph.

The State charged appellant with felony murder based upon the commission of the felony offense of injury to a child by intentional, knowing, reckless, or criminally negligent conduct, to wit: shaking the child complainant with appellant's hand and causing the child complainant's head to strike an object, resulting in the child's death. The jury was also charged on the lesser-included offense of bodily injury to a child through criminal negligence, and it convicted appellant of that offense. A person commits the lesser-included offense if, by the person's act, the person intentionally, knowingly, recklessly, or with criminal negligence causes bodily injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(3) (West 2011). A "child" is a person fourteen years of age or younger. *See id.* § 22.04(c)(1). The term "bodily injury" refers to "physical pain, illness, or an impairment of physical condition." *Id.*. § 1.07(a)(8) (West 2011).

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and justifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(d) (West 2011). Injury to a child, either by omission or overt action, is a "result of conduct" offense such that the culpable mental state relates not to the nature or circumstances of the charged conduct, but to the result of that conduct. *Kelley v. State*, 187 S.W.3d 761, 763 (Tex. App.—Houston [14th

Dist.] 2006, pet. ref'd). In sum, the accused must have acted with the requisite mental state to effect the result. *See id.* Mental culpability can be inferred from circumstances of the act, from words, or from the extent of the injury and the relative size and strength of the parties. *Id.* Likewise, the extent of a complainant's injuries is a reflection of the strength of a defendant's conduct. *See id.* The key to criminal negligence is not the actor's awareness and disregard of a substantial risk, but rather the actor's failure to perceive the risk at all. *See Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012).

To be sufficient to support appellant's conviction, the record evidence must show that appellant should have been aware of the substantial and justifiable risk that his conduct would cause the child physical pain, illness, or an impairment of physical condition. *See* Tex. Penal Code Ann. §§ 1.07(a)(8), 6.03(d), 22.04(a)(3); *Montgomery*, 369 S.W.3d at 193. Appellant asserts that the evidence showed the child's injuries could only have been caused by an intentional act, and there is no evidence they could have been caused by a negligent act or that he should have been aware of a substantial and justifiable risk that the child's injuries would occur. We disagree.

The record reflects that appellant interacted alone with the child on February 14, 2010, and February 28, 2010. Doctors testified that the child suffered two separate injuries to his head around these same dates. On the first of these two occasions, the evidence shows that appellant had been rocking the child and the child struck his head on the wall; Kendra heard and investigated a "thump." On the second occasion, the evidence shows that appellant bumped the left side and back side of the child's head into the door or door frame and again on a crib rail, which resulted in a loud enough "thump" to wake Kendra. Appellant admitted two of the "head bump" incidents, stated that the child's head hit "pretty hard," and

9

expressed remorse at trial that he caused the child to strike his head. The record shows that the child cried or whimpered in the hours after the incidents and exhibited other symptoms requiring medical care. The record also shows that the child sustained bleeding and bruises to his brain, retinal damage, and two skull fractures stemming from at least two separate incidents. *See Kelley*, 187 S.W.3d at 763 (considering evidence of retinal damage from a "severe blow to the head" as part of sufficiency analysis for injury to a child). According to the testimony of a medical expert, the child's symptoms of vomiting, diarrhea, decreased appetite, and lethargy—as exhibited on February 14, 2010—were consistent with brain injury. Likewise, the medical expert testified that the child's symptoms including lethargy, limp body, whining, and breathing irregularities—as exhibited on February 28, 2010—were also consistent with brain trauma. Medical experts ruled out scenarios involving a short fall or accidental head-strikes, as described by appellant, none of which could have caused the same injuries and fatal fractures that the child sustained. *See id.* (considering medical expert testimony that discredited theories of an accidental injury to a baby as part of sufficiency analysis).

Given this evidence, including the testimony of the physician and the medical examiner, the facts surrounding the circumstances in which the child was in appellant's care, the relative size of a five-month-old child, appellant's own statements about the child's "head bumps," and the child's symptoms and medical treatment following the "head bumps," appellant should have known there was a substantial and justifiable risk that his conduct in causing the child to strike his head against hard objects or surfaces would cause the child physical pain, illness, or an impairment of his physical condition. Tex. Penal Code Ann. § 1.07(a)(8); *see Montgomery*, 369 S.W.3d at 193 (concluding that elements of criminal

10

negligence were met in a criminally negligent homicide); *Kelley*, 187 S.W.3d at 764 (concluding evidence was sufficient to support reckless bodily injury to a child).

Appellant acknowledged that while he did not feel it was important to tell Kendra about the five-month-old child complainant bumping his head, appellant felt it was necessary to go to the hospital for his own head injury that he sustained on the evening of February 28, 2010. If on February 14, 2010, appellant was not aware of the substantial and justifiable risk of bodily injury that a five-month-old child would sustain if his head hit a hard surface, appellant ought to have been aware of that risk on February 28. *See Montgomery*, 369 S.W.3d at 193 (noting criminal negligence involves an accused that ought to have been aware of a substantial and justifiable risk that the conduct could result in the type of harm that occurred). Given the circumstances, a jury could reasonably have concluded that appellant ought to have been aware of the substantial and justifiable risk of harm to the child that his actions created. *See id.* at 194. The risk of the child's injuries was of such a nature that appellant's failure to perceive the risk was a gross deviation from the reasonable standard of care exercised by most people. *See id.* A jury reasonably could have found that appellant's failure to appreciate the substantial and justifiable risks, given the circumstances known to him at the time, was a gross deviation from the standard of care that an ordinary person would exercise under the same circumstances. *See id.*

Regarding appellant's assertion that the evidence supports only intentional conduct, record evidence does show that the child's injuries were non-accidental. But proof of a greater level of culpability necessarily constitutes proof of a less culpable mental state, such that evidence of intentional conduct is also evidence of criminal negligence. *See Hicks v. State*, 372 S.W.3d 649, 653–54 (Tex. Crim. App.

11

2012).  Appellant also asserts that by finding appellant guilty of the lesser-included offense, the jury categorically rejected the State's contention that appellant had intentionally or knowingly caused the injuries to the child, as required by the greater offense charged.  But appellant's argument does not affect our sufficiency analysis regarding whether the evidence supports his conviction for injury to a child through criminal negligence.  *See Moranza v. State*, 913 S.W.2d 718, 724 (Tex. Crim. App. 1995) (holding that when jury renders inconsistent verdict, "instead of summarily finding the evidence legally insufficient to support the jury's verdict of guilt, an appellate court should examine the legal sufficiency of the evidence to support the counts on which the conviction was rendered").

Viewing the evidence under the prevailing standard, the jury could have found beyond a reasonable doubt that appellant caused the child bodily injury by criminal negligence.  *See* Tex. Penal Code Ann. §§ 6.03(d), 1.07(a)(8).  We therefore hold that the record contains sufficient evidence to support the appellant's conviction of bodily injury to a child through criminal negligence, and we overrule appellant's second issue.

## II.  The trial court did not err in denying appellant's challenge for cause.

In his first issue, appellant complains of a veniremember's response relating to the range of punishment for felony murder.  The record shows that the trial court informed the venire that the offense of felony murder carries a range of punishment from five years to ninety-nine years' confinement.  The court asked each row of the venire collectively whether they had concerns or were unable to consider the minimum range of five years' confinement and then individually questioned several veniremembers regarding whether they had a problem deciding punishment.  During this questioning, veniremember 22 did not indicate that he

12

was unable to consider the full range of punishment. Appellant complains of the following exchange when the trial court asked, "Anybody else?"

> [Veniremember 22]: Yeah, I have a little bit of a problem with the range, you know, 5 years versus such a variety there. It seems like, yeah, if it goes that way, it's hard to be, and I think something this serious where someone dies, you know, the light end of the 5 years.

> [Court]: Well, I guess my question is, could you imagine a situation in your mind? I mean, and I only guess you certainly don't have to say what it is—it wouldn't be appropriate for me to ask you— but could you think of a situation where in a felony murder case you would be able to consider the lower end of the range? And I know it's not easy, because these are not things you think about on a daily basis.

> I gave you the example of some teenagers that set a fire, not intended. This is the type of murder that there's no intent that the person gets killed, not like a regular murder case. And so the question is—

> . . . . [discussion at the bench not relevant to this appellate issue]

> Can you—I guess what I'm asking you, can you keep an open mind as to the full range of punishment until you've heard the facts both at the guilt/innocence phase of the trial and the punishment phase and then decide what the appropriate punishment would be or have you already excluded the minimum range of punishment?

> [Veniremember 22]: It's hard to think someone's life is worth just a few years, what can lead on to afterwards that gets reduced in the system to a little bit. It's kind of hard to think a life is worth just a few years.

> [Court]: Fair enough.

Appellant did not assert any objection or challenge for cause based on this exchange, and the trial court continued questioning other potential jurors.

The prosecutor posed questions regarding range of punishment, referring to punishment as a "toolbox" of possible punishment ranges or "tools" that the

13

veniremembers could use in deliberations to determine an appropriate punishment based on the evidence. The prosecutor asked the venire whether they could take all of the "tools" to deliberations to find an appropriate punishment. When the prosecutor questioned veniremember 22 about keeping an open mind and assessing the minimum range of five years when the facts are appropriate, appellant approached the bench and objected to additional questioning for rehabilitative purposes. The trial court stated, "Okay. Some of the jurors were at least ambiguous in their response, so I will let her question them; however, one of the jurors in response to your questions indicated they can't consider the full range." After a brief conversation about veniremember 21, who the parties agreed to excuse, appellant asserted an objection to several veniremembers including veniremember 22, claiming that they had expressed an inability to consider the low end of the punishment range. The trial court ruled that the prosecutor could ask slightly different questions than the ones it had previously posed. The prosecutor resumed her questioning of veniremember 22 in the following exchange:

> [Prosecutor 1]: Okay, Juror No. 22, I believe we left off with you. So now that I have kind of given you some other examples, can you wait to listen to the facts and then consider 5 years if it's appropriate and consider life if it's appropriate?
>
> . . . .
>
> [Veniremember 22]: I say that when you give other examples, it has something, you have the tools, but I still think life is worth—it would be difficult to go on the low end.
>
> [Prosecutor 1]: And you may in your mind think that there's not that many situations where 5 is appropriate, and that's okay. But if you heard those facts come forward and you felt like it was appropriate, would you follow your feelings and give 5 years if you felt like that was appropriate?

[Veniremember 22]: I could consider it, yes.

Appellant asserted no objections or challenges at this point.

Appellant's trial counsel asked the venirepanel if they were unable to consider the low end of the punishment range if a child complainant were a younger child; the State's objection to the question was sustained. The record shows that several veniremembers, including veniremember 22, raised their hands in response to an unclear query from trial counsel regarding a child under the age of 15.[1] Trial counsel posed no other questions regarding punishment range and asserted no objections or challenges to veniremember 22.

Outside of the jury's presence, the trial court removed veniremembers based upon the parties' agreement; neither party raised an objection to veniremember 22. The trial court then instructed the parties to make their strikes. After both sides had exercised their peremptory challenges, the jury was seated, but not yet sworn. Veniremember 22 was not seated on the jury, but veniremember number 43 was. At this time, the following discussion occurred at the bench:

> [Appellant's counsel]: As for the record, Your Honor, based on previous discussions, again I would restate my position that my challenge for cause on No. 22, because he had previously stated a bias that we discussed earlier, since I now had to exercise a peremptory challenge on him.

---

[1] The record is unclear what question was posed to the venire. After the trial court sustained the State's commitment objection to trial counsel's question whether the panel members could consider the low end of the punishment range based on the age of a younger child, appellant's trial counsel stated, "Okay. Let me move on. Oh, let me do this. I've got a number—again, let's just go down the row. First row, if you would raise your hand, starting with Mr. Allen there. I know you raised your hand. Just hold your hand up again. And I'll tell you what, there's so many of you, let me just go down and you give me your juror number." Several veniremembers stated their numbers. In response to a veniremember's question whether counsel's question applied to all children, counsel stated that "a child by law is under the age of 15." Other veniremembers, including number 22, stated their numbers.

15

[Court]:  What challenge for cause was it?  I don't recall there being a challenge for cause not being granted.

[Prosecutor 2]:  There was a punishment issue and she rehabilitated him.

[Prosecutor 1]:  You didn't bring it up in the challenges.

[Appellant's counsel]:  I already made my point at the time.  My position is, he already demonstrated that bias and therefore there is no rehabilitation.

[Court]:  Okay. I understand.

[Appellant's counsel]:  And that's the one that was denied, and that's what I'm talking about.

[Court]:  Okay.  So go ahead for the record.

[Appellant's counsel]:  And so because of that, I was—I didn't have a strike to strike No. 43, who would be unacceptable under other circumstances, so I would request an additional peremptory challenge.

[Court]:  Refresh my memory.  This was a juror that initially indicated they could not consider the full range and then ended up vacillating and saying they could.

[Appellant's counsel]:  Yes.

[Court]:  Okay.  Your request for an additional strike is denied.

Later during the trial, veniremember 43, who was identified by trial counsel as unacceptable, was excused for a scheduling conflict; appellant agreed to excuse veniremember 43.  Veniremember 43 did not participate in deliberations and was replaced with the alternate juror.

Appellant asserts that he preserved error on his challenge for cause.  To preserve error regarding a trial court's allegedly erroneous denial of a challenge for cause, the record must show that: (1) appellant asserted a clear and specific

16

challenge for cause, which was denied; (2) he used a peremptory strike on the complained of veniremember; (3) he used all of his peremptory strikes; (4) his request for additional peremptory strikes was denied; and (5) a juror appellant identified as objectionable sat on the jury." *See Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010).  On this record, we conclude appellant failed to preserve error.

The record shows that appellant failed to assert a clear and specific challenge for cause.  Although he objected to further questioning of veniremember 22, and the trial court overruled that objection, appellant did not assert any objection to veniremember 22 when both parties identified veniremembers that were challengeable for cause.  It was only after both parties had asserted peremptory challenges and after the jury had been seated that appellant claimed to have been denied a challenge for cause.  Appellant has failed to preserve error. *See Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004) (holding defendant who did not raise challenge for cause when asked by court, but later requested an additional peremptory challenge to strike an "unacceptable" juror who allegedly could not consider mitigation evidence, did not preserve error); *see also Gardner v. State*, 306 S.W.3d 274, 297–98 (Tex. Crim. App. 2009) (concluding that defendant failed to preserve error on denial of challenge for cause when he focused on asking additional questions that would have supported a challenge for cause rather than asserting an actual challenge for cause and receiving a denial).

Even if appellant had preserved his challenge for cause, he has not shown any error requiring reversal.  A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *See Gardner*, 306 S.W.3d at 296. When a veniremember's answers are ambiguous, vacillating, unclear, or

contradictory, as veniremember 22's were, we give deference to the trial court's decision. *See id.* In addition, the record shows that veniremember 43, who appellant claimed was objectionable, was released from jury service and replaced by an alternate juror before the jury began deliberations. When an otherwise objectionable juror is seated on the jury but does not participate in jury deliberations, a defendant has not been harmed. *See Cooks v. State*, 844 S.W.2d 697, 722 (Tex. Crim. App. 1992). Likewise, appellant has not suffered harm because the jury convicted appellant of a lesser-included offense with a different punishment range. *Cf. King v. State*, 953 S.W.2d 266, 268 (Tex. Crim. App. 1997) (holding any error in denial of challenge for cause based on veniremember's stated inability to consider the full range of punishment on lesser-included offense was harmless when jury convicted defendant of greater offense and never considered punishment on lesser-included offense). We overrule appellant's first issue.

### CONCLUSION

Having overruled appellant's two issues, we affirm the judgment.

/s/           J. Brett Busby
              Justice

Panel consists of Justices Christopher, Jamison, and Busby.
Do Not Publish — TEX. R. APP. P. 47.2(b).

18