**Affirmed and Opinion filed June 16, 2015.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-14-00009-CR

_____

**ADALBERTO MARTINEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 412th District Court
Brazoria County, Texas
Trial Court Cause No. 71837**

## O P I N I O N

In two issues, appellant Adalberto Martinez challenges the sufficiency of the evidence in support of his conviction for serious bodily injury to a child and the trial court's admission at trial of videos showing the child experiencing a seizure and undergoing a medical procedure. After the jury found appellant guilty, it assessed punishment at 50 years' confinement. We affirm.

## Background

Appellant lived with his girlfriend, Stefanie, their two children, and Stefanie's parents and other family members. Appellant was recovering from surgery and not working but had the primary responsibility of taking care of his three-month-old son, D.C.

One evening after appellant had been alone with D.C. for a large portion of the day, Stefanie gave D.C. a bottle. He would not take much milk, which was unusual, and fell asleep in Stefanie's lap. D.C. woke up screaming, and then his body became limp. Stefanie ran to get her mother, Maria. When Maria got to D.C., he had vomited, was not breathing, and was turning blue. Maria performed CPR, and Stefanie called 911.

A police officer arrived and observed that D.C. still was not breathing. The officer patted D.C. on the back, and D.C. spit up and began taking shallow breaths. After the paramedics arrived, D.C. was transported, unconscious, to the hospital.[1] D.C. subsequently was transferred to a children's hospital, where he remained in the neonatal intensive care unit (NICU) for approximately two weeks.

After D.C. had been in the NICU for nine or ten days, his doctor informed Stefanie and her mother that D.C. "could remain a vegetable the rest of his life, or . . . be severely mentally retarded." He might never walk "or be a normal little boy." Stefanie stepped out of D.C.'s hospital room to deliver the news to appellant. Maria thereafter stepped out and heard appellant telling Stefanie he was "sorry" and it was "his fault D.C. was in the hospital." Maria confronted appellant, yelling "[y]ou did this. You need to leave. You need to get out of here." Appellant left and never returned to the hospital. Maria reported appellant's statement to the Texas

---

[1] At the hospital, appellant refused to consent to the medical staff's photographing "medical, surgical, and/or diagnostic procedures" performed on D.C.

Department of Family and Protective Services (the Department), which had already opened an investigation to determine the nature of D.C.'s injuries.

D.C. ultimately was transferred to a rehabilitative hospital and stayed there for two to three months. As a result of D.C.'s injuries, he cannot see, talk, sit up, or walk. He developed violent seizures and must be fed through a tube in his stomach. He also had to wear a helmet to help reshape a large dent in the back of his head.

During the course of the Department's investigation, appellant offered several different explanations for how D.C. was purportedly injured. First, appellant told a Department caseworker he had no idea what happened, although he insisted D.C. could have been injured in the hospital. In a second interview with another caseworker, appellant again denied knowing what happened to D.C. However, in a third interview with another caseworker, appellant claimed he was carrying D.C. and bumped his head on the doorway to the bathroom, but he did not tell the doctor about this incident because he was "never alone with the doctor." He also said that his two-year-old daughter may have hit D.C. with a Gatorade bottle. He said he "didn't mean for anything to happen to" D.C. and admitted that when D.C. became unresponsive, appellant was afraid he would go to jail.

A police officer subsequently conducted a videotaped interview of appellant, which was played at trial for the jury. Appellant said he hit D.C.'s head on the doorframe, but D.C. did not cry. The officer asked appellant how D.C. had sustained two older injuries. Appellant then offered for the first time the following possible explanations for D.C.'s injuries that appellant claimed were accidents: (1) appellant hit D.C.'s head on the sink while giving him a bath; (2) appellant might have played too rough with D.C.; (3) appellant put D.C. down on the bed quickly to attend to his daughter when she fell down and "maybe [D.C.] hit his head"; (4) appellant's daughter "head butts the baby"; (5) appellant sometimes

3

shook the baby but not hard; and (6) one time appellant hit the front of D.C.'s head on the headboard of his and Stefanie's bed. Appellant did not want to tell the doctor about these incidents because he was "scared" and did not want to tell Stefanie because "she might flip out."

The State's expert at trial, Dr. Marcella Donaruma, testified that D.C. had suffered chronic abusive head trauma. Regular shaking over time could have caused some but not all of D.C.'s injuries.[2] One of his injuries was a contact injury resulting from an impact to his head with an object that had a greater surface area than his head and caused swelling of the head and bruising of the brain. The trauma affected four areas of D.C.'s brain, which indicated the abuse occurred more than once. Older injuries were at least a week old by the time D.C. was admitted to the hospital. Donaruma testified the injuries could not have been caused by a routine accident, such as by D.C.'s sister head-butting him or hitting him with a Gatorade bottle or by someone hitting D.C.'s head on a headboard or bumping it into a door jamb or sink. The injuries were caused by a "massive, severe, violent force applied to [D.C.'s] body." Donaruma had questioned appellant and Stefanie the day D.C. was admitted into the children's hospital. She

---

[2] Donaruma testified,

> [A] baby has . . . a very weak, floppy neck. They can't lift their head up until they are at least four months old; and [D.C.] wasn't.
>
> So they have this little, wimpy neck and then this really big, heavy head. So they have no head control at all; and if you've handled a baby, you can see that. You have to support them.
>
> And so when they do suffer this whiplash, their head will go back; and the back of their head will impact behind their shoulder blades and their chin will come forward and slam into their breast bone. And while that is happening, the brain, this soft little brain is slamming back and forth into the skull and inside itself.
>
> And the problem is, it works; and so people do it more than once because the kids get concussed and they're quiet and they stop [crying].

4

described appellant as "quite aggressive, reluctant to answer questions directly, and border[ing] on hostile."

D.C.'s treating doctor, a pediatric neurologist, also testified that D.C. suffered three brain injuries that left him in a permanent state of disability known as "quadriplegic cerebral palsy." The first type of injury resulted from repeated acceleration and deceleration "causing a shearing of force on the brain" as well as an impact to the head. The second was hypoxic ischemia, meaning the brain did not get oxygen during the time D.C. was not breathing. The third resulted from bleeding in his skull that caused pressure on his brain. These injuries were consistent with "non-accidental trauma" caused by shaking and an impact to the head. The doctor concluded that there were older and newer injuries consistent with the findings in D.C.'s medical records that he had suffered "abusive head trauma."

*Discussion*

Appellant challenges (1) the sufficiency of the evidence in support of the jury's finding that he intentionally or knowingly caused serious bodily injury to D.C., and (2) the trial court's admission of videos showing the nature of D.C.'s injuries.

## I. Sufficiency of the Evidence

In his first issue, appellant claims the State failed to establish beyond a reasonable doubt that he intentionally or knowingly caused serious bodily injury to D.C. When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *See Gear v. State*, 340 S.W.3d

5

743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). In making this review, we consider all evidence in the record, whether it was admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence.[3] *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

Appellant challenges the sufficiency of the evidence to prove that he intentionally or knowingly caused serious bodily injury to D.C. as alleged in the indictment. *See* Tex. Penal Code § 22.04. A person acts intentionally when "it is his conscious objective or desire to engage in the conduct or cause the result." *Id*. § 6.03(a). A person acts knowingly when "he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). Serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the

---

[3] Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. The Court of Criminal Appeals has determined that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *See Griego v. State*, 337 S.W.3d 902, 903 (Tex. Crim. App. 2011) (per curiam). Therefore, in analyzing appellant's challenge to the sufficiency of the evidence, we will apply only the *Jackson v. Virginia* standard.

function of any bodily member or organ." *Id*. at § 1.07(a)(46).

Injury to a child is a result-oriented crime. *Kelley v. State*, 187 S.W.3d 761, 763 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). That means the culpable mental state relates to causing the result rather than merely engaging in the conduct. *Id*. Mental culpability usually must be inferred from the circumstances. *Id*. It may be inferred from the extent of injury and the relative size and strength of the parties. *Id*. The extent of a victim's injuries thus can be a reflection of the strength of a defendant's attack. *Id*.

Appellant contends the State failed to introduce evidence that would show he engaged in the conduct necessary to cause D.C.'s injuries. He asserts that he offered explanations of how D.C. *accidentally* could have been injured, but there was no evidence that he intentionally or knowingly injured D.C. To the contrary, Donaruma testified that D.C.'s injuries could not have been caused by a routine accident. She specifically refuted appellant's purported explanations regarding the cause of D.C.'s injuries as being head-butted and hit with a Gatorade bottle by his sister or appellant's hitting D.C.'s head on a headboard or sink or bumping it into a doorframe. Donaruma testified that the necessary force to cause D.C.'s injuries "would be the kind of handling that any reasonable adult would see and immediately feel like they have to intervene, knowing it could be harmful to a child. It exceeds any force you would need to move the child from bathing, dressing, changing a diaper." D.C.'s injuries were consistent with repeated violent shaking and a forceful impact to the head. Both experts testified that D.C.'s injuries were caused by abusive, non-accidental head trauma. The severity of D.C.'s injuries supports an inference that they were caused intentionally and knowingly. *See Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

7

Appellant also argues that the State failed to prove that D.C.'s injuries were not inflicted by someone else. Appellant was D.C.'s primary caretaker and was alone with him most of the day during the month leading up to D.C.'s hospital stay. Appellant was the only adult with D.C. for most of the day and evening prior to Stefanie's feeding him and his becoming unresponsive. Appellant further admitted that none of the women in the house caused D.C.'s injuries. Stefanie also testified that her father was never alone with D.C. This evidence supports an inference that appellant—and not someone else—injured D.C. *See id.*

The injuries precipitating D.C.'s becoming unresponsive occurred within hours of when D.C. was transferred to the children's hospital. This evidence also points to appellant as the likely perpetrator because he had been alone with D.C. at the approximate time he sustained extremely severe injuries. *See id.* (citing *Martin v. State*, 246 S.W.3d 246, 262 (Tex. App.—Houston [14th Dist.] 2007, no pet.), for the proposition that, among other things, a defendant's being alone with a baby during the time in which the baby suffered blunt force trauma was legally sufficient evidence of guilt).

Appellant argues, however, that he was too weak from surgery to injure D.C. On cross-examination, appellant testified that he was not strong enough to injure D.C. on the night he went to the hospital because appellant recently had had surgery. However, on cross-examination, the State's attorney elicited testimony from appellant agreeing that he was able to demonstrate to the officer two weeks later how he purportedly injured D.C. The jury, as the sole judge of credibility, was entitled to disbelieve appellant's testimony that he was too weak to injure D.C. *See Martin*, 246 S.W.3d at 262. Moreover, as set forth above, appellant, a grown man, had been alone with D.C. during the approximate time he sustained grave injuries. The jury could infer that appellant was strong enough to cause D.C.'s injuries. *See*

*Kelley*, 187 S.W.3d at 764 (concluding jury, in finding appellant recklessly injured child, could consider "the extent of the baby's injuries, the relative size of a three-month-old baby compared to appellant, and the expert testimony that a severe trauma was the cause of the baby's injuries").

Appellant also made the following admissions that support the jury's verdict: it was his fault that D.C. was in the hospital, he sometimes shook D.C. but not hard, he knew shaking an infant could be harmful, he was scared to tell Stefanie and the doctors about his role in D.C.'s injuries, and he was afraid he would go to jail. Further, appellant's explanations of how D.C. might have been injured evolved over the course of the investigation, which also supports an inference of culpable intent. *See Kemmerer v. State*, 113 S.W.3d 513, 516 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("[T]he jury could have viewed appellant's changing versions of the incident as evidence of guilt."). Moreover, appellant failed to tell anyone about these alleged accidents until long after D.C.'s admission into the hospital. Appellant resisted providing information to medical staff—he refused to consent to their taking photographs of procedures performed on D.C. and did not tell them about the purported incidents that he later asserted caused D.C.'s injuries. He was aggressive, reluctant to answer questions, and hostile. *See Martin*, 246 S.W.3d at 262 (concluding the following evidence, among other things, supported jury finding that appellant caused fatal injuries to child: appellant's failure to call 911 and delay in taking victim to emergency room, her reaction when someone else tried to call 911, witness testimony regarding her demeanor and behavior, and her inconsistent statements given to social worker and police).

Viewing all of the evidence in the record in the light most favorable to the verdict, we conclude that the evidence was legally sufficient to permit a jury to

find beyond a reasonable doubt that appellant intentionally or knowingly caused serious bodily injury to D.C. We overrule appellant's first issue.

## II. Admission of Videos

In his second issue, appellant argues that the trial court abused its discretion in admitting videos of D.C. experiencing seizures and undergoing a medical procedure.[4] Under Rule of Evidence 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Probative value" refers to the inherent probative force of an item of evidence—specifically, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Id*. Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id*. Accordingly, in determining whether the trial court abused its discretion in admitting the videos, we must balance the inherent probative force of the proffered item of evidence along with the proponent's need for that evidence against any

---

[4] Appellant refers on appeal only to State's exhibit 1, which appellant contends shows D.C. having seizures and undergoing a medical procedure. However, that exhibit is a video of D.C. having seizures, and State's exhibit 25 shows D.C.'s doctor administering Botox injections to D.C. to reduce spasticity in his muscles that are tight. Because appellant's attorney objected at trial to both videos on the basis that their probative value is substantially outweighed by the danger of unfair prejudice, we shall construe appellant's brief liberally as a challenge to the admissibility of both videos.

10

tendency of the evidence to suggest decision on an improper basis.[5] *See id.*

We presume that the probative value of evidence substantially outweighs the danger of unfair prejudice from admission of that evidence. *Cargill v. State*, No. AP-76,819, 2014 WL 6477109, at *6 (Tex. Crim. App. Nov. 19, 2014). It is therefore the defendant's burden to demonstrate that the danger of unfair prejudice substantially outweighs the probative value. *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In reviewing the trial court's balancing determination under Rule 403, we are to "reverse the trial court's judgment rarely and only after a clear abuse of discretion." *Id.*

Appellant has not indicated how the evidence presented in the videos would be substantially outweighed by the danger of unfair prejudice. Appellant merely contends that D.C.'s condition *could have been* demonstrated through testimony from his treating physicians without use of the videos.[6]

**Probative Value and State's Need for Evidence**. The trial court in this case reasonably could have concluded that the inherent probative force of the videos was considerable, since those videos showed the nature and gravity of D.C.'s injuries. *See Gigliobianco*, 210 S.W.3d at 642. Evidence of D.C.'s seizures and the medical treatment that he must endure tends to emphasize the seriousness of his injuries. Moreover, because the State was required to show D.C. suffered

---

[5] The Court of Criminal Appeals has identified several factors to be considered in conducting the Rule 403 balancing test. *Gigliobianco*, 210 S.W.3d at 641. Because appellant challenges the admission of the evidence only on the basis that it was unfairly prejudicial, we need only address the 403 factors relevant to that issue. *See, e.g., Cargill v. State*, No. AP-76,819, 2014 WL 6477109, at *7 (Tex. Crim. App. Nov. 19, 2014) (balancing only factors relevant to whether probative value of evidence was substantially outweighed by unfair prejudice when appellant's Rule 403 challenge was limited to that basis); *see also Kappel v. State*, 402 S.W.3d 490, 494-95 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (focusing on probative value versus unfair prejudice when appellant challenged evidence only on that basis).

[6] Appellant also reiterates his evidentiary sufficiency challenge in issue two. We need not revisit the merits of that issue discussed above.

11

serious bodily injury, the trial court reasonably could have concluded that the State's need for the evidence was considerable. *See id*.

**Unfair Prejudice**. The trial court also reasonably could have concluded that the videos did not have a tendency to suggest decision on an improper basis because they relate directly to the charged offense—that appellant caused serious bodily injury to D.C. *See id*. We note that a video need not be excluded simply because it reflects the gruesomeness or reality of the crime. *Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001). Although testimony regarding D.C.'s condition could have been—and was—admitted through D.C.'s physicians, the videos conveyed what testimony could not: a visual representation of the seriousness of D.C.'s injuries. They were thus unique pieces of evidence, and the fact that testimony could have presented evidence of D.C.'s condition is not a sufficient reason to exclude the videos.[7] *See id*. (holding videotape of recovery of victim's body was not cumulative of photographs because "videotape offer[ed] a panoramic view of the scene that still photographs often do not offer").

We conclude the probative value of the videos was not substantially outweighed by unfair prejudice. This evidence was probative in assessing the serious nature of D.C.'s injuries. *See Cargill*, 2014 WL 6477109, at *7. The State needed the evidence to demonstrate D.C. suffered serious bodily injury. *See id*. The trial court did not abuse its discretion by admitting the videos. We overrule appellant's second issue.

---

[7] Appellant does not argue the videos needlessly presented cumulative evidence. *See* Tex. R. Evid. 403. We note that the videos were very short, under two minutes each.

We affirm the judgment of the trial court.


/s/     Martha Hill Jamison
Justice


Panel consists of Justices Jamison, Busby, and Brown.
Publish — TEX. R. APP. P. 47.2(b).