**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00222-CR**
_____

**DONALD GLENN BROWN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 260th District Court**
**Orange County, Texas**
**Trial Cause No. D180150-R**

**MEMORANDUM OPINION**

Donald Glenn Brown appeals his conviction for the offense of injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(3), (f). Following a joint bench trial, the trial court found Brown and his co-defendant, Daniel Keith Spencer, guilty of recklessly injuring A.P., a child for whom they acted as guardians. The indictment alleged that Brown injured A.P. by hitting her with a belt. The trial court sentenced Brown to two years of confinement plus a $1,500 fine but suspended the sentence and placed him on community supervision. In three issues, Brown complains that:

1

(1) the evidence was insufficient to show that Brown was the perpetrator; (2) the evidence was insufficient to establish the acts alleged to constitute the offense were reckless and not reasonable discipline; and (3) reversible error occurred when the State failed to provide exculpatory information. For the following reasons, we will affirm.

**Background and Trial Evidence**

D.P.'s Testimony

D.P., A.P.'s mother, testified during trial. A.P., the complainant, lived with Brown and his husband, Spencer, pursuant to a voluntary arrangement with D.P. According to D.P., A.P. began having behavioral issues which necessitated her being separated from her sister and required help. Spencer reached out and offered to allow A.P. to stay with him and Brown. D.P. testified that towards the end of 2016, she allowed A.P. to stay with them, and A.P. remained there until early 2017. While A.P. was with Brown and Spencer, D.P. had contact with her but agreed that for practical purposes, Brown and Spencer acted as her guardians, which she believed was good for A.P.

D.P. explained that A.P. had issues in school and significant behavioral issues, and she had spanked A.P. in the past. D.P. testified that A.P. sometimes had problems with authority but did not include parental authority. D.P. testified that

2

A.P. is currently treated for "obsessive defiance disorder" and bipolar disorder, and A.P. takes medication and regularly sees a psychologist and counselors.

In February 2017, a Child Protective Services ("CPS") caseworker, Kellie Lambert, notified D.P. that A.P. had possibly been abused. D.P. testified that Lambert encouraged her to press charges against Brown and Spencer, and Lambert was at D.P.'s house when D.P. called the police. D.P. explained that she had a friend pick A.P. up from school, and while her friend did so, D.P. called the police a few minutes before A.P. arrived home. That same day, A.P. returned to live with D.P., and D.P. terminated the agreement with Brown and Spencer. D.P. observed the marks on A.P. and testified that "[s]he was covered from her rib cage down to her knee, all the way around her body." D.P. also explained that A.P. has a dark complexion, so bruises do not show up easily on her. D.P. testified that following the incident, A.P. has not had any physical issues, but has had problems with acting out, nightmares, crying spells, and anger.

A.P.'s Testimony

A.P. testified that she lived with Brown and Spencer when she was seven or eight. A.P. said she stopped living with them, "[b]ecause they were beating me." She explained that "[t]hey were, like, using either a leather belt or making me go outside and pick my own sticks." A.P. testified that at the time she stopped living with them, she could not remember if they used a leather belt or a stick or which one would

3

spank her. She told a teacher that she could not sit down, and they sent her to the nurse who took pictures, but A.P. did not remember if she told the nurse what happened. After she went to the nurse, A.P. returned to live with D.P. A.P. did not recall if her mom took her to a doctor after she met with the school nurse.

A.P. testified that nobody has spanked her like Brown and Spencer; she was spanked when she was younger, but now she just gets grounded. A.P. said her mom would spank her with a flip-flop "but it wouldn't hurt that much." When Brown and Spencer spanked her, "it hurt really bad." A.P. agreed spankings should hurt, and the point was to send a message to stop the behavior. When she lived with Brown and Spencer, they punished her for things like not doing the dishes or getting in trouble at school. A.P. testified that Brown and Spencer sometimes had to discipline her for lying.

A.P. remembered going to live with Brown and Spencer and agreed they provided her with a good home "[f]or the most part." A.P. testified that Brown and Spencer took her off her bipolar medication. A.P. explained that she was not diagnosed with "obsessive defiance disorder" until last month, because she was "getting in trouble a lot" at school, so they switched her medications. A.P. testified that she sees a psychologist or psychiatrist once a month. She also described meeting with a school counselor twice a week.

4

<u>Jennifer Stanley's Testimony</u>

A.P.'s school nurse, Jennifer Stanley, testified that in February, A.P. came to her office and requested an ice pack. When Stanley asked A.P. why she needed an ice pack, A.P. responded she had a bruise that hurt and complained of pain in her hip and leg area. Stanley asked A.P. if she could see it, which A.P. allowed, and Stanley observed the bruise. Stanley described the bruising as "significant" and noted it covered her "[h]ip, buttocks, [and] leg." Stanley said that A.P. reported that her foster dad spanked her for lying but did not specify if it was one or both who spanked her. Stanley initially testified that A.P. did not indicate what they spanked her with, but the bruises were "linear[,]" so it appeared to "maybe be something linear." Ultimately, Stanley testified that upon further questioning, A.P. told her she was whipped with a belt, which Stanley acknowledged was not included in her statement. Stanley also agreed that after A.P. asked if she called CPS, A.P. said she was unsure if all the bruises were from the whipping.

Stanley testified she did not know if one spanking caused all the bruising or if it resulted from multiple spankings over multiple days. Stanley felt whether to spank children and what was a reasonable amount of discipline was up to each parent. Stanley was aware that certain disorders could cause people to bruise more easily, but she did not have any documentation to indicate that being so for A.P. and did not know if A.P. was someone who bruised more easily.

5

Stanley confirmed she took photographs the State offered as Exhibits 1 through 3, verified they were true and accurate, and the trial court admitted them without objection. Stanley testified A.P. had bruising "on the upper hip towards the abdomen[,]" reflected in State's Exhibit 2. Given the bruises, Stanley referred the matter to CPS the same day. Stanley testified that A.P. lived with her foster family at the time, and Stanley only interacted with A.P.' foster family in her office. She had dealt with A.P. before while she lived with her foster family but did not have A.P. back in her office for a similar incident after this.

Kellie Lambert's Testimony

The CPS investigator assigned to the case, Lambert, testified that in February 2017, she investigated a physical abuse allegation involving A.P., and the alleged perpetrators were Brown and Spencer. Lambert testified that she met with A.P. during the investigation and observed "[b]ruising to her buttocks and upper thighs around her right hip."

Based on her investigation, Lambert said the injuries appeared to have occurred while A.P. was with Brown and Spencer. Lambert said she went to D.P.'s home and called Spencer first to discuss the allegations. She told Spencer that A.P. had bruising on her bottom and legs and how A.P. said it occurred. Lambert testified that Spencer was "calm" and confirmed they spanked A.P. for lying. Spencer further acknowledged the spanking "was a little excessive this time." Lambert said that

6

about ten minutes after she spoke with Spencer, Brown called her. Brown told her the State gives him permission to discipline his child the way he did. Lambert then told Brown that D.P. was terminating her agreement with them, and Brown and Spencer should not contact A.P as she would not return to their home. Brown responded that he would seek legal counsel, did not feel the discipline was excessive, and that Lambert needed a court order and judge to keep A.P. from returning to their home. Lambert testified she did not discuss filing criminal charges with D.P. then, and D.P. seemed willing to protect A.P. Lambert testified that from CPS's point of view, "parents are allowed to discipline their children as long as it's not excessive and doesn't leave marks or bruises on their body[,]" but Lambert also explained she was "not familiar with the criminal side of it."

When asked about whether spankings over a period of weeks or months could have caused the bruising, Lambert said it was "based on what A.P. told me on when it happened." Lambert did not have A.P. see a doctor, did not collect medical records, and did not have testing done to see if A.P. had a disorder that caused her to bruise easily. Lambert testified that CPS relies on parents to provide that information and whether the children had conditions that required medications, and D.P. denied A.P. had those conditions. Lambert agreed that if a large amount of force is used when spanking, it will normally leave a bruise. Lambert outlined the remaining steps in her investigation, which included sending photographs to the Forensic Assessment

7

Center Network ("F.A.C.N.") physician. Lambert concluded there was "reason to believe" physical abuse occurred by Brown and Spencer.

Leonard Smith's Testimony

Leonard Smith, who worked as a Vidor Police Department detective sergeant at the time of the incident, also testified. Smith investigated the February 2017 injury to a child case and became involved about three weeks after A.P. initially met with the school nurse. Smith explained he received a report indicating it involved spanking, then looked at the pictures. When he realized the suspects had not provided statements, he contacted them to see if they wanted to. Smith testified he spoke with Brown, explained the allegations against him, and told Brown he would allow him to share his side of the story. Brown told Smith they spanked A.P. but said gymnastics and a medical disorder caused the bruising. Smith testified that Brown and Spencer made an appointment to provide a statement but did not keep it, so Smith called, and they told him they spoke to their attorney and did not wish to provide a statement. According to Smith, at that point, he could do nothing else, so he gathered the information from CPS and Garth House and filed the case with the D.A.'s office. Smith testified he did not have a doctor examine A.P. and never talked to A.P., because given her age, Garth House conducted the interview. The Garth House interview occurred three weeks after the incident, which Smith observed, but nobody mentioned gymnastics during the interview.

8

Smith testified that he regularly told people that the law allows parents or guardians to discipline their children if it does not involve deadly force. He agreed this case did not involve serious bodily injury or death. Smith testified that D.P. allowed Brown and Spencer to act as parents, which included discipline.

Jessica Koester's Testimony

Jessica Koester, a family friend of D.P. and A.P., also testified. Koester explained that she considered A.P. and D.P. family, and she knew of the incident involving A.P. Koester picked A.P. up from school that day and saw the bruises. Koester testified that she took photos of the bruises herself, because D.P. wanted them and described the bruises as "pretty bad." Koester said that the bruises were on her "[l]ower back, her side, down one of her thighs, and across her bottom." Koester knew why A.P. was living away from D.P. and had met Brown and Spencer a few times.

Koester testified that after the incident, Brown reached out to her through Facebook Messenger. Koester characterized the conversation as "a lot of excuses" where Brown advised them to consider other causes for A.P.'s injuries like a blood disorder, clothing dye, or a fall in gymnastics. In these messages Brown mentioned some things that may have caused A.P.'s injuries, but at one point he said they would not spank her again. Koester testified it appeared Brown felt they spanked her too hard, and Brown's solution was "they just wouldn't spank her again." According to

9

Koester, Brown and Spencer planned to adopt A.P. and wanted her back in their home.

Koester confirmed Brown sent messages that read as follows:

> Did we spank her too hard? Probably; but not to the extent that you or [D.P.] have described.
> . . .
>
> We wouldn't ever hurt her intentionally.
>
> . . .
>
> I don't believe we are the cause, but we are willing to never spank her again so that cause can be eliminated as a possible cause.

Koester said she could not tell the court medically how or when the bruises occurred, but she has not seen similar bruises on A.P. since.

<u>Other Evidence</u>

Other evidence admitted during trial included three photographs that showed bruising on A.P.'s bottom, legs, side, hip, and lower back.

<u>Motion for New Trial and Exculpatory Evidence</u>

After the trial court found Brown and Spencer guilty of recklessly injuring A.P., the defense filed a Motion for New Trial and additional briefing to support the motion. Brown complained the State failed to provide additional photographs taken after this incident and a photograph taken a couple months earlier that showed similar bruising. Brown also argues that the State failed to provide him with information regarding a CPS investigation involving similar allegations of abuse in

10

December 2016 where the same F.A.C.N. physician involved in this case ruled out abuse in the earlier case.

**Issues One and Two: Sufficiency**

In his first two issues, Brown challenges the sufficiency of the evidence. We review the sufficiency of the evidence to support a conviction under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under that standard, we view all the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318–19). In a bench trial, the trial judge is the sole trier of fact and judge of the witnesses, and the trial court may choose to believe or disbelieve some or all of the witnesses who testified. *See Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. [Panel Op.] 1978). We defer to the factfinder's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319).

In this case, to find Brown guilty of injury to a child, the trial court was required to find that Brown recklessly caused bodily injury to a child fourteen years

of age or younger. *See* Tex. Penal Code Ann. § 22.04(a)(3). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8). Injury to a child is a result-oriented crime, requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Here, the trial court had to determine Brown acted recklessly.

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c); *see also Williams*, 235 S.W.3d at 750. "Mental culpability usually must be inferred from the circumstances of the act or words." *Kelley v. State*, 187 S.W.3d 761, 763 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998)); *see also Assiter v. State*, 58 S.W.3d 743, 748 (Tex. App.—Amarillo 2000, no pet.). It may also be inferred from the extent of injury and the parties' relative size and strength. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Kelley*, 187 S.W.3d at 763. The extent of the victim's injuries reflects the strength of a defendant's attack, and therefore involves the defendant's conduct. *Kelley*, 187 S.W.3d at 763.

Brown raised the justification of reasonable discipline by a parent or someone acting "in loco parentis[.]" *See* Tex. Penal Code Ann. § 9.61(a). "In loco parentis" includes individuals acting as guardians or "anyone who has express or implied consent of the parent[.]" *Id.* § 9.61(b). Texas law states that "[t]he use of force, but not deadly force, against a child younger than 18 years is justified: (1) if the actor . . . is acting in loco parentis to the child; and (2) when and to the degree the actor reasonably believes the force is necessary to discipline the child[.]" *Id.* § 9.61(a). The Texas Penal Code defines "reasonable belief" as ". . . a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

Since reasonable discipline is a justification, the State does not have to affirmatively produce evidence refuting the claim; instead, the State must prove its case beyond a reasonable doubt. *Goulart v. State*, 26 S.W.3d 5, 10 (Tex. App.—Waco 2000, pet. ref'd); *see also* Tex. Penal Code Ann. § 9.02 (providing that justification is a defense). A guilty finding is an implicit finding against the defensive theory. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). A parent's use of force under section 9.61 is not justified simply based on their subjective belief, "rather, the use of force is justified only if a reasonable person would have believed the force was necessary to discipline the child or to safeguard or promote the child's welfare." *Quattrocchi v. State*, 173 S.W.3d 120, 122 (Tex. App.—Fort Worth 2005,

13

pet. ref'd) (emphasis omitted) (quoting *Assiter*, 58 S.W.3d at 748). "Reasonable belief" is an objective standard. *See id.*; *see also* Tex. Penal Code Ann. § 1.07(a)(42).

Brown first complains that the evidence was insufficient to establish he was the perpetrator, as A.P. only complained that "they" spanked her. However, the trial testimony established that "they" included Brown and Spencer. Specifically, A.P. testified that she lived with Brown and Spencer, and she stopped living with them, "[b]ecause they were beating me." Lambert identified the alleged perpetrators as Brown and Spencer. Stanley also testified that A.P. reported to her that her "foster dad" spanked her. Additionally, the CPS investigator testified that Spencer told her "they" spanked A.P. and acknowledged it was excessive. Finally, Koester testified that Brown himself sent a message to her acknowledging "we" probably spanked A.P. too hard. A.P. also testified they would use a belt or "sticks," and Stanley testified that A.P. reported they used a belt. Viewing this evidence in the light most favorable to the verdict and deferring to the factfinder's role to resolve conflicts in testimony and weigh the evidence, we conclude the evidence was sufficient to support that Brown committed the alleged acts. *See Temple*, 390 S.W.3d at 360; *Hooper*, 214 S.W.3d at 13. We overrule issue one.

Brown next complains that the evidence is insufficient to establish the acts constituting the offense were reckless and not reasonable discipline of the child. It is undisputed that at the time of the offense Brown and Spencer acted in loco

14

parentis. As explained above, the evidence showed that both Brown and Spencer acknowledged they spanked A.P. A.P. testified that nobody has spanked her like Brown and Spencer, and when Brown and Spencer spanked her, "it hurt really bad."

Evidence at trial included photographs depicting substantial bruising on A.P.'s bottom, legs, and hip. Multiple witnesses also testified regarding the extensive bruising A.P. sustained. Stanley's testimony established that A.P. experienced pain that required her to seek treatment from the nurse and an ice pack. *See* Tex. Penal Code Ann. § 1.07(a)(8) (definition of "bodily injury" includes "physical pain"). The nurse testified that A.P. said she was whipped with a belt and described linear bruising. The nurse also testified that given the bruising, she reported the incident to CPS the same day.

Lambert testified that from CPS's point of view, "parents are allowed to discipline their children as long as it's not excessive and doesn't leave marks or bruises on their body." Lambert agreed that if a large amount of force is used when spanking, it will normally leave a bruise. When asked about whether spankings over a period of weeks or months could have caused the bruising, Lambert said it was "based on what A.P. told me on when it happened." D.P. denied that A.P. ever had issues with bruising or had similar bruises before or since the incident, even though she had spanked A.P. Likewise, Koester testified that she had not seen similar bruises on A.P. since. Stanley was aware that certain disorders could cause people

15

to bruise more easily, but she did not have any documentation to indicate that being the case for A.P. Stanley testified she would not know if the bruising was all from one spanking or multiple spankings over multiple days.

Again, viewing the evidence in the light most favorable to the verdict, we conclude the trial court could have found the essential elements of the offense beyond a reasonable doubt and thereby rejected Brown's justification of the use of force by a guardian for discipline or to safeguard or promote the child's welfare. There was ample evidence to support the trial court's finding that Brown recklessly caused bodily injury to A.P., who was then younger than fourteen. *See Ezeh v. State*, No. 06-18-00141-CR, 2019 WL 1141249, at *3 (Tex. App.—Texarkana Mar. 13, 2019, pet. ref'd) (mem. op., not designated for publication) (determining same under similar facts). A.P. reported pain in her legs and hip the day after the incident and requested an ice pack from Stanley the, who observed "significant" bruising. The bruises were linear in nature which supported that a linear object was used. A.P. relayed to the nurse that she had been whipped by her "foster dad" the day before. The trial judge heard testimony to this effect and testimony that Brown acknowledged "we" spanked the child. The trial judge saw photos of A.P.'s injuries, heard from school staff that she was in pain a day after the incident, and heard testimony from a CPS caseworker that when a large amount of force is used in spanking it usually leaves a bruise.

16

Thus, the trial evidence would allow a rational factfinder to conclude that Brown recklessly caused bodily injury to A.P. Further, the evidence supported the factfinder's implicit rejection of the defensive theory and a determination beyond a reasonable doubt that an ordinary and prudent person in the same circumstances as Brown would not have disciplined A.P. by using a belt to repeatedly whip her, leaving multiple visible bruises. Accordingly, we conclude the evidence is sufficient to support the verdict. *See Goulart*, 26 S.W.3d at 10–12 (evidence, including photographs and testimony concerning strikes given, was sufficient to sustain verdict and rejection of parental discipline justification); *Assiter*, 58 S.W.3d at 748–51 (evidence, including testimony concerning bruising after spanking, was sufficient for factfinder to reject parental discipline justification). We overrule issue two.

**Issue Three: Exculpatory Evidence**

In his third issue, Brown complains the State failed to provide exculpatory evidence in violation of statutory and constitutional requirements. Brown contends this evidence included photographs and a 2016 report including a physician's finding that "almost identical markings" to the child resulted in a finding of no abuse.

Brown raised these complaints in a Motion for New Trial. We review a trial court's denial of a motion for new trial for an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling and uphold it if it falls within the zone of

17

reasonable disagreement. *Id.* We do not substitute our judgment for the trial court's, instead we decide whether the trial court's decision was arbitrary or unreasonable. *Id.*

In his Motion for New Trial and on appeal Brown outlines several pieces of evidence he claims were exculpatory that the State withheld. These include: (1) a CPS investigation report into a December 2016 allegation that Brown physically abused A.P. by spanking;[1] (2) an accompanying photograph from the December 2016 investigation; and (3) additional photographs from CPS's February 2017 investigation. Brown contends CPS had this information in its file, and it was available to law enforcement.

A *Brady* violation occurs when the State suppresses, willfully or inadvertently, evidence favorable to the defendant. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a defendant must show that (1) the prosecutor failed to disclose evidence, (2) the evidence is favorable to the accused, and (3) the evidence is material. *Harm*, 183 S.W.3d at 406.

Prosecutors have a duty to learn of *Brady* evidence known to others acting on the State's behalf in a particular case. *Harm*, 183 S.W.3d at 406. *Brady* does not

---

[1] Brown's appellate brief refers to this as a "letter" but the record cite indicates it is part of a CPS report containing the F.A.C.N. physician's opinion.

18

require prosecutors to disclose exculpatory information that the State does not have in its possession and that is not known to exist. *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011); *Harm*, 183 S.W.3d at 407. Similarly, the State does not have a duty to disclose if the defendant was actually aware of the exculpatory evidence or could have accessed it from other sources. *Pena*, 353 S.W.3d at 810. Under *Brady*, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is one that undermines confidence in the outcome. *Id.*

Texas Code of Criminal Procedure article 39.14 places an affirmative duty to disclose any exculpatory, impeachment, or mitigating document, item, or information in its possession, custody, or control that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged. *See* Tex. Code Crim. Proc. Ann. art. 39.14(h). The Legislature did not limit article 39.14(h)'s applicability to "material" evidence, so this duty to disclose is broader than the prosecutor's duty to disclose as a matter of due process under *Brady*. *See Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021). The word "material" appearing elsewhere in article 39.14 means "having a logical connection to a consequential fact" and is synonymous with "relevant" considering the statutory context. *See id.* at 290. If the State fails to comply with article 39.14 by not turning over evidence, we

must conduct a harm analysis. *See id.* at 291 (determining the State failed to turn over exhibits in violation of 39.14 and remanding case to court of appeals for harm analysis); *Sopko v. State*, 637 S.W.3d 252, 256 (Tex. App.—Fort Worth 2021, no pet.) (requiring a harm analysis if a trial court abuses its discretion in violation of 39.14). We disregard any non-constitutional error that does not affect an appellant's substantial rights. *See* Tex. R. App. P. 44.2(a). In nonjury proceedings, to determine if an error implicated a substantial right, we consider "whether a party had a right to that which the error denied." *Johnson v. State*, 72 S.W.3d 346, 348–49 (Tex. Crim. App. 2002); *Sopko*, 637 S.W.3d at 257. If the error implicated a substantial right, we examine the entire record to determine the error's potential impact on the factfinder's decision. *Coble v. State*, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010); *Hastings v. State*, 20 S.W.3d 786, 791 (Tex. App.—Amarillo 2000, pet. ref'd) (applying standard to nonjury proceeding).

For purposes of our analysis, we will assume without deciding that the State failed to turn over favorable or exculpatory evidence under *Brady* and article 39.14. During the evidentiary hearing on the Motion for New Trial several witnesses testified including a CPS attorney, Lambert, and Stanley. After the trial, the defense subpoenaed the CPS records described above, and a CPS attorney presented them during the hearing on the Motion for New Trial for in camera inspection. Additionally, the State provided the discovery logs showing that Brown's attorneys

20

downloaded the 2017 CPS report Lambert prepared prior to trial that included Brown's previous CPS history with A.P., and Brown's attorney acknowledged receiving the 2017 report. Specifically, the 2017 CPS report indicated that in December 2016 A.P. outcried after a spanking, CPS investigated, and a F.A.C.N. physician ruled out physical abuse in that case and determined despite A.P.'s report "that her bruising was the result of a spanking she received, the spanking and bruising were not connected. It would be impossible for her to get bruising on her upper front thigh when she g[o]t spankings while laying face down on an ottoman." The F.A.C.N. physician "reported that the 'bruising' looked more like an allergic reaction to something and believes that is the source of the marks."

Brown also complains that the State failed to provide him with various photographs. With respect to the additional 2017 photographs that Brown mentions, some showed A.P.'s injuries from different angles while she wore different clothing.[2] CPS took a photograph during the December 2016 CPS investigation which showed a large patch of red skin on the front of A.P.'s thigh that appeared to be a rash with diffuse bruising along the outer edges.

Brown contends the F.A.C.N. physician's previous determination of no abuse under similar circumstances with similar injuries was significant. However, even if he did not have the 2016 CPS report, the record establishes that Brown had this

---

[2] All photographs were sealed in the record.

information prior to trial as it was contained in the 2017 CPS report. We also note that none of the F.A.C.N. physician's opinions were introduced at trial, the F.A.C.N. physician did not testify, and no CPS reports containing her opinions that this instance of spanking constituted abuse were admitted into evidence during trial.[3]

As previously noted, the additional photographs from the February 2017 investigation were cumulative as they showed the same injuries as those admitted during trial. The single photograph from 2016 shows what appears to be a rash on the front of A.P.'s thigh, surrounded by diffuse bruising, where the F.A.C.N. physician ruled out abuse. Despite Brown's contrary characterization of the 2016 photograph, this was dissimilar from the linear and patterned bruising predominantly on A.P.'s bottom, lower back, hips, and side that resulted from the February 2017 spanking.

Evidence adduced at trial showed that Brown and Spencer admitted to spanking A.P. on this occasion. A witness testified that Brown acknowledged they had "probably" spanked A.P. too hard, and another witness testified Spencer acknowledged the spanking was excessive. Further, the evidence established that these injuries were patterned and linear in nature, as distinguished from the rash-like appearance on the front of A.P.'s thigh that resulted in CPS ruling out abuse in 2016.

---

[3] The CPS reports were only admitted during the hearing on the motion for new trial.

Assuming without deciding that the State failed to turn over the complained-of evidence, we conclude Brown has failed to show under *Brady* that even if the evidence had been disclosed, there is a reasonable probability the outcome would have been different. *See Bagley*, 473 U.S. at 682. We further determine that the State's failure to disclose evidence in violation of article 39.14, if any, was harmless. *See Watkins*, 619 S.W.3d at 291; *see also* Tex. R. App. P. 44.2(a). We overrule this issue.

## Conclusion

Having overruled Brown's issues, we affirm the trial court's judgment.

AFFIRMED.

_____

W. SCOTT GOLEMON
Chief Justice

Submitted on April 26, 2022
Opinion Delivered June 8, 2022
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.